656 S.E.2d 451

**Donna Joan BLANKENSHIP, An Individual, et al., Plaintiffs Below, Appellants,**

v.

**ETHICON, INC., A New Jersey Corporation, et al., Defendants Below, Appellees.**

**No. 33224.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 11, 2007.

Decided Oct. 12, 2007.

Concurring in Part and Dissenting in Part Opinion of Starcher Dec. 26, 2007.

Marvin W. Masters, The Masters Law Firm, lc, Charleston, WV, for Appellants.

Thomas J. Hurney, Jr., Laurie K. Miller, Jackson Kelly P.L.L.C., Charleston, WV, for Appellee, Herbert J. Thomas Memorial Hospital Association.

Richard D. Jones, Amy R. Humphreys, Flaherty Sensabaugh & Bonasso, P.L.L.C., Charleston, WV, for Appellee, Charleston Area Medical Center, Inc.

DAVIS, Chief Justice.

■ The Appellants, plaintiffs in the action below, who received medical treatment involving the implantation of contaminated sutures as patients at two hospitals named as defendants below, appeal the dismissal of their action against the defendant hospitals for failure to provide pre-suit notices and certificates of merit as required by the Medical Professional Liability Act. *See* W. Va. Code § 55–7B–6(b) (2001) (Supp.2002).[1] The plaintiffs argue that, because they have not asserted medical malpractice claims, they are not bound to comply with the pre-suit requirements of the Medical Professional Liability Act (hereinafter referred to as "the MPLA"). We conclude that the determina-

---

1. The instant action was filed on June 2, 2003, and is therefore governed by the 2001 version of the MPLA. *See* W. Va.Code § 55–7B–10(a) (2003) (Supp.2007) ("The amendments to this article as provided in House Bill 601, enacted during the sixth extraordinary session of the Legislature, two thousand one, apply to all causes of action alleging medical professional liability which are filed on or after the first day of March, two thousand two."). W. Va.Code § 55–7B–6 was amended in 2003; however, those amendments do not affect our resolution of this appeal.

tion of whether a cause of action falls within the MPLA is based upon the factual circumstances giving rise to the cause of action, not the type of claim asserted. Therefore, the circuit court was correct in finding that the plaintiffs must comply with the MPLA. However, we find the circuit court's dismissal of this action to be unduly harsh, and remand this case to afford the plaintiffs an opportunity to amend their complaint and otherwise comply with the MPLA.[2]

## I.

## FACTUAL AND PROCEDURAL HISTORY

Charleston Area Medical Center, Inc.[3] and Herbert J. Thomas Memorial Hospital Association,[4] defendants below and appellees before this Court (hereinafter collectively referred to as "the defendant hospitals"), pur-

chased Vicryl sutures[5] "for use by surgeons and other health care providers to close wounds or incisions or to join tissue."

On June 2, 2003, the plaintiffs filed the underlying putative class action lawsuit in the Circuit Court of Kanawha County alleging that they sustained infections, injuries and damages after improperly sterilized Vicryl sutures had been placed in their bodies.[6] Plaintiffs asserted numerous claims against the several defendants collectively, including claims of product liability (including negligence, strict liability and breach of express and implied warranties); violations of the West Virginia Consumer Credit and Protection Act, W. Va.Code § 46-6-101 *et seq.*; fraud; and intentional infliction of emotional distress.[7] Plaintiffs sought compensatory and punitive damages, as well as equitable relief.[8]

---

**2.** The author of this opinion, separate from the remaining Justices serving on this honorable Court, has repeatedly expressed her view that the MPLA requirements for providing pre-suit notice and a certificate of merit represent an unconstitutional infringement upon this Court's rule-making powers. *See, e.g., Davis v. Mound View Health Care, Inc.,* 220 W.Va. 28, 33, 640 S.E.2d 91, 96 (2006) (Davis, C.J., dissenting) ("As I stated in *Hinchman*, the pre-suit requirements of the [MPLA] encroach upon this Court's constitutional authority to promulgate procedural rules for litigating in the courts of this State."); *Hinchman v. Gillette,* 217 W.Va. 378, 387, 618 S.E.2d 387, 396 (2005) (Davis, J., concurring) ("[T]he majority opinion should have reversed this case on the grounds that the certificate of merit requirement violated the Separation of Powers/Rule-making Clauses and the Certain Remedy Clause of the West Virginia Constitution."). Insofar as the constitutionality of the pre-suit requirements of the MPLA are not at issue in the instant case, it is written so as to conform with existing law.

**3.** The circuit court found that "Charleston Area Medical Center, Inc., is a tax exempt, not for profit West Virginia corporation which operates hospitals in Charleston, West Virginia."

**4.** The circuit court further found that "Herbert J. Thomas Memorial Hospital Association is a tax exempt, nonprofit West Virginia corporation which operates Thomas Hospital in South Charleston, West Virginia."

**5.** According to the circuit court's findings,

Vicryl sutures are used during some procedures to close wounds or incisions or to join tissue. Vicryl sutures are "absorbable," mean-

ing they are left in the body, dissolve as the incision heals naturally and are absorbed by the body.

**6.** In addition to the defendant hospitals, the plaintiffs also named as defendants the manufacturer of Vicryl sutures, Ethicon, Inc., a New Jersey corporation, and various corporations that distributed surgical sutures to health care providers in West Virginia. The various distributer defendants are: Johnson & Johnson Hospital Services, Inc., a New Jersey corporation; Johnson & Johnson Health Care Systems Inc., a New Jersey corporation; Seneca Medical, Inc., an Ohio corporation; Skyland Hospital Supply, Inc., a Tennessee corporation; Amerisource Medical Supply, Inc., a Tennessee corporation; Baxter Healthcare Corporation, a Delaware corporation; McKesson Medical–Surgical Medimart Inc., a Minnesota corporation; and Owens & Minor, Inc., a Virginia corporation. There are no issues involving any defendants other than the defendant hospitals presently before this Court.

**7.** Several of the defendants, Ethicon, Inc., and related companies, removed the action to the United States District Court for the Southern District of West Virginia alleging fraudulent joinder of non-diverse defendants (the defendant hospitals). The plaintiffs filed a motion to remand on August 4, 2003. By order dated November 6, 2003, the Honorable Joseph R. Goodwin granted the plaintiffs' motion and ordered the case remanded to the Circuit Court of Kanawha County.

**8.** The equitable relief sought by the plaintiffs is to require the defendant hospitals to investigate and determine what patients were implanted with the Vicryl sutures and to then inform the patients so

The defendant hospitals filed a joint motion to dismiss on July 3, 2003, asserting four grounds for dismissal: (1) the MPLA constitutes the sole remedy for actions against health care providers, and plaintiffs' claims of product liability, outrage, fraud and violations of the Consumer Credit and Protection Act are not permitted under the MPLA; (2) the plaintiffs failed to comply with the MPLA's requirements for serving notices of claim and certificates of merit; (3) West Virginia common law does not permit product liability claims against health care providers as distributers or sellers of products; and (4) the plaintiffs' claims are time barred.

The plaintiffs responded by asserting the following arguments against dismissal: (1) the MPLA is not the exclusive remedy available against health care providers; (2) the MPLA does not in clear and unambiguous terms prohibit claims against health care providers for product liability, tort of outrage, fraud and violations of the Consumer Credit and Protection Act; (3) the causes of action raised in their complaint do not assert medical malpractice, and thus are not governed by the MPLA and its prerequisites to filing suit; (4) the common law does not prohibit product liability and related claims from being brought against health care providers as distributers and sellers of products; and (5) the discovery rule applies to the running of the relevant statutes of limitation.

Following a hearing on the defendant hospitals' joint motion to dismiss, the circuit court found that the MPLA applied. The circuit court then ruled that the plaintiffs' failure to provide a "Notice of Claim" and "Screening Certificate of Merit" as required by the MPLA, and their additional failure to plead mandatory elements of an MPLA action as set forth in W. Va.Code § 55–7B–3 (1986) (Repl.Vol.2000),[9] required dismissal of their case.

On July 23, 2004, the plaintiffs' (hereinafter referred to as "the Appellants") filed in this Court a petition appealing the circuit court's order grating the defendant hospitals' joint motion to dismiss. On December 9, 2004, this Court issued an order remanding the case to the circuit court for consideration of the Court's simultaneously announced opinion in *Boggs v. Camden–Clark Memorial Hospital Corp.,* 216 W.Va. 656, 609 S.E.2d 917 (2004). On remand, by order entered on March 14, 2006, the circuit court again granted a joint motion by the defendant hospitals' to dismiss the Appellants' complaint. Thereafter, on July 11, 2006, the Appellants filed a petition for appeal in this Court. We granted the petition and now affirm, in part, and reverse, in part, the circuit court's ruling, and we remand this case for further proceedings consistent with this opinion.

## II.

### STANDARD OF REVIEW

The instant case is before this Court on appeal from an order granting the defendant hospitals' joint motion to dismiss. "Appellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo.*" Syl. pt. 2, *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.,* 194 W.Va. 770, 461 S.E.2d 516 (1995). Because our review is *de novo,* we must be mindful of the standards applied by the circuit court. In this regard, we note that "[t]he trial court, in appraising the sufficiency of a complaint on a Rule 12(b)(6) motion, should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Syl. pt. 2, *West Virginia Canine College, Inc. v. Rexroad,* 191 W.Va. 209, 444 S.E.2d 566 (1994) (internal quotations and citations omitted). In other words, "a motion to dismiss should be granted only where 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Ewing v. Board of Educ. of County of Summers,* 202 W.Va. 228, 235, 503 S.E.2d 541, 548 (1998) (citations omitted). With due regard for the foregoing standards, we proceed to discuss the substantive issues raised in this case.

identified of the defective condition of those sutures.

9. W. Va.Code § 55–7B–3 was amended in 2003, but those amendments to not impact our decision in this case.

## III.

## DISCUSSION

Appellants raise several assignments of error related to the circuit court's rulings below. However, we need address only one dispositive issue: whether the MPLA provides the exclusive remedy for the Appellants' claims against the defendant hospitals. Once we resolve this issue, we can then determine whether the circuit court's dismissal of the Appellants' claims against the defendant hospitals was proper.

### A. MPLA as Exclusive Remedy

The Appellants argue that the circuit court erred by concluding that their claims are governed by the MPLA. They contend that none of their claims against the defendant hospitals were asserted under the MPLA, and argue further that the MPLA was not intended to alter or supplant West Virginia common law or statutory law as it relates to those claims. While it is true that none of the appellants' claims were asserted under the MPLA, the question we must answer is whether those claims should have been brought under the MPLA.

This Court has twice addressed the issue of what claims must be brought under the MPLA. We first addressed this issue in *Boggs v. Camden–Clark Memorial Hospital Corp.*, 216 W.Va. 656, 609 S.E.2d 917 (2004). In *Boggs*, the plaintiff's decedent stopped breathing and went into cardiac arrest after she had been administered a spinal anesthetic in preparation for surgery to repair her broken ankle. She died several days later. Mr. Boggs, her husband, filed suit against the anesthesiologist, his practice group, and the hospital. In addition to asserting claims for medical malpractice, the complaint also asserted claims for negligent hiring and retention, vicarious liability, fraud, the destruction of records, the tort of outrage, and spoliation of evidence. Several of these non-

malpractice claims related to an alleged cover-up following Mrs. Boggs' death.

▇ In filing his lawsuit, Mr. Boggs failed to comply with the pre-suit requirements of the MPLA. As a result, the circuit court concluded that all of Mr. Boggs's claims were barred by the MPLA. Accordingly, the circuit court dismissed all of Mr. Boggs's claims against all of the defendants, even those that were not based on medical malpractice. On appeal, this Court observed that

> [b]y the MPLA's own terms, it applies only to "medical professional liability actions," and the Legislature has provided a definition:
>
> (i) "Medical professional liability" means any liability for damages resulting from the death or injury of a person for any tort or breach of contract based on health care services rendered, or which should have been rendered, by a health care provider or health care facility to a patient.
>
> W.Va.Code § 55–7B–2(i) (2003). *Thus the MPLA can only apply to health care services rendered, or that should have been rendered.*

*Boggs v. Camden–Clark Mem'l Hosp. Corp.*, 216 W.Va. at 662, 609 S.E.2d at 923 (footnote omitted) (emphasis added).[10] This Court went on to explain that

> Fraud, spoliation of evidence, or negligent hiring are no more related to "medical professional liability" or "health care services" than battery, larceny, or libel. There is simply no way to apply the MPLA to such claims. *The Legislature has granted special protection to medical professionals, while they are acting as such. This protection does not extend to intentional torts or acts outside the scope of "health care services."* If for some reason a doctor or nurse intentionally assaulted a patient, stole their possessions, or defamed them, such actions would not require appli-

---

10. Although the instant action is governed by the 2001 version of the MPLA. *See infra* note 1, W. Va.Code § 55–7B–2 was not amended in 2001. Thus, it is actually the 1986 version of that particular section that was in effect at the time this action was filed. In the 1986 version, the definition of "medical professional liability" appeared at subsection (d). However, the text of the 1986 version contains language identical to that quoted by the *Boggs* Court. The current version of § 55–7B–2(i), which became effective on June 9, 2006, is likewise identical to the text quoted in *Boggs*.

cation of the MPLA any more than if the doctor or nurse committed such acts outside of the health care context.

*Id.* at 662–63, 609 S.E.2d at 923–24 (emphasis added). This Court then held

> The West Virginia Medical Professional Liability Act, codified at W. Va.Code § 55–7B–1 *et seq.*, applies only to claims resulting from the death or injury of a person for *any tort or breach of contract based on health care services rendered*, or which should have been rendered, by a health care provider or health care facility to a patient. It does not apply to other claims that may be contemporaneous to or related to the alleged act of medical professional liability.

Syl. pt. 3, *Boggs*, 216 W.Va. 656, 609 S.E.2d 917 (emphasis added).

This Court again addressed whether a claim fell within the MPLA in *Gray v. Mena*, 218 W.Va. 564, 625 S.E.2d 326 (2005). The plaintiff in *Gray* had been "admitted to [the hospital] with swelling in her lower extremities, abdominal pain, high blood sugar, a hormone deficiency, and Addison's disease." *Id.* at 567, 625 S.E.2d at 329 (footnote omitted). The physician who examined her did so "in a hospital room behind a closed curtain in the absence of a nurse or other staff member." *Id.* During the examination, and without Ms. Gray's consent, the doctor "inserted his non-gloved finger into her vagina." *Id.* Ms. Gray contended that the procedure "was not medically necessary and constituted an assault and battery." *Id.* She brought a civil action against the physician, his practice group, and the hospital, asserting claims for "assault and battery, sexual assault and/or sexual abuse, outrage, intentional infliction of emotional and mental distress, and/or negligent infliction of emotional or mental distress." *Id.* at 567 n. 3, 625 S.E.2d at 329 n. 3. The lower court granted the defendants' mo-

tion to dismiss based upon Ms. Gray's failure to comply with the pre-suit provisions of the MPLA. The *Gray* Court ultimately concluded that Ms. Gray was required to comply with the MPLA, but nevertheless reversed the dismissal of her action in order to allow such compliance.

In deciding *Gray*, this Court reviewed the *Boggs* opinion and noted that it was not strictly on point with the claims asserted by Ms. Gray in that the claims of fraud, destruction of records, and spoliation of evidence asserted in *Boggs* "did not arise within the course of an actual physical examination," while Ms. Gray's claims did arise from "the action of the physician in the context of an ostensible examination." *Gray* at 568 n. 7, 625 S.E.2d at 330 n. 7.

Expressing concern that the Court's earlier decision in *Boggs* might be misconstrued as holding that intentional torts would always fall outside the MPLA, the *Gray* Court held:

> This Court's opinion in *Boggs v. Camden–Clark Memorial Hospital Corp.*, 216 W.Va. 656, 609 S.E.2d 917 (2004), is clarified by recognizing that the West Virginia Legislature's definition of medical professional liability, found in West Virginia Code § 55–7B–2(i) (2003) (Supp.2005), includes liability for damages resulting from the death or injury of a person for *any* tort based upon health care services rendered or which should have been rendered. To the extent that *Boggs* suggested otherwise, it is modified.

Syl. pt. 4, 218 W.Va. 564, 625 S.E.2d 326.[11]

■ Of particular relevance to the instant case, the *Gray* Court observed that the determination of whether the Medical Professional Liability Act, W. Va.Code § 55–7B–1 *et seq.*, applies to certain claims is a fact-driven question.[12] Thus,

> the particular facts [of a case] will impact the applicability of [the Act]. For instance,

---

11. The author of this opinion wrote a concurring opinion in *Gray* that agreed with the Court's resolution of that case, but disagreed with the majority insofar as it concluded that the *Boggs* case was unclear. *See Gray*, 218 W.Va. at 572, 625 S.E.2d at 334 (Davis, J., concurring) ("[I]t is clear that the only type of intentional torts the *Boggs* Court found to be outside the rubric of the MPLA were those intentional torts that do not

pertain to the rendering of 'health care services.' ").

12. We point out that, while the applicability of the MPLA is based upon the facts of a given case, the determination of whether a particular cause of action is governed by the MPLA is a legal question to be decided by the trial court.

where the allegedly offensive action was committed within the context of the rendering of ["health care,"] the statute applies. Where, however, the action in question was outside the realm of the provision of ["health care,"] the statute does not apply.

*Gray* at 570, 625 S.E.2d at 332. Accordingly, we now hold that the failure to plead a claim as governed by the Medical Professional Liability Act, W. Va.Code § 55–7B–1, *et seq.*, does not preclude application of the Act. Where the alleged tortious acts or omissions are committed by a health care provider within the context of the rendering of "health care" as defined by W. Va.Code § 55–7B–2(e) (2006) (Supp.2007), the Act applies regardless of how the claims have been pled.

We further hold that, pursuant to W. Va. Code § 55–7B–2(e) (2006) (Supp.2007), "health care" is defined as "any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to or on behalf of a patient during the patient's medical care, treatment or confinement." [13]

■ In the instant case, all of the Appellants' claims against the defendant hospitals arise from the same factual event, the "implantation" of contaminated sutures into the various Appellants. The implantation of sutures is a classic example of health care. Sutures, by their very nature, are implanted during the course of and in furtherance of medical treatment, *i.e.,* surgery or wound repair. Both *Boggs* and *Gray* identified examples of the types of conduct that would be outside the scope of the MPLA. The examples given in those cases reflect conduct that is unrelated to providing medical care. *See, e.g., Gray v. Mena,* 218 W.Va. at 568, 625 S.E.2d at 330 ("Fraud, spoliation of evidence, or negligent hiring are no more related to 'medical professional liability' or 'health care services' than battery, larceny, or libel.'" (quoting *Boggs,* 216 W.Va. at 662, 609 S.E.2d

at 923)); [14] *Boggs* 216 W.Va. at 663, 609 S.E.2d at 924 ("If for some reason a doctor or nurse intentionally assaulted a patient, stole their possessions, or defamed them, such actions would not require application of the MPLA any more than if the doctor or nurse committed such acts outside of the health care context.").

In reaching its decision that the MPLA applied to the Appellants' claims against the defendant hospitals in the case *sub judice,* the circuit court explained:

Where the allegations of a complaint fall within its provisions, the MPLA governs. There is no dispute that the plaintiffs are patients, and both hospital defendants in this matter are health care providers and facilities. There is no dispute that the plaintiffs received health care services and the complaint revolves around an integral part of the health care services rendered. The core allegations of the complaint center upon the performance of surgical procedures and the use of unsterile sutures during the procedures. Surgeries and the sutures used during surgery fit squarely within the definition of "health care" which includes treatment furnished to a patient. Moreover, the MPLA expressly applies to "any liability for damages ... for any tort or breach of contract based on health care services rendered...." W. Va.Code § 55–7B–2(d). The plaintiffs seek recovery against defendants on a variety of tort and quasi-contractual theories. The fact they label them as "products" claims does not change the fundamental basis of this tort action. The court finds, therefore, that this action is governed by the MPLA, and the plaintiffs are bound by its requirements.

(Footnotes omitted). We find no error in the circuit court's conclusions, and therefore affirm that portion of the circuit court's order finding that the Appellants' claims against

**13.** While we cite to W. Va.Code § 55–7B–2(e) (2006) (Supp.2007), an identical definition of "health care" was in effect at the time the underlying action was filed and can be found at W. Va.Code § 55–7B–2(a) (1986) (Repl.Vol.2000).

**14.** While the *Boggs* Court identified "fraud" as a tort that would typically fall outside the MPLA, we note that in cases such as the instant one, where the fraud alleged was part of the medical treatment rendered or which should have been rendered, such a claim falls squarely within the MPLA.

the defendant hospitals must be brought under the MPLA. Accordingly, the Appellants' claims must be asserted so as to comport with the elements of proof set out in W. Va.Code § 55–7B–3 (1986) (Repl.Vol.2000).[15]

### B. Appellants' Lack of Compliance with the MPLA

■ After concluding that the Appellants' claims must be brought under the MPLA, the circuit court proceeded to dismiss the claims due to the Appellants' failure to comply with the MPLA's pre-suit notice and certificate of merit requirements.[16] *See* W. Va.Code § 55–7B–6(b) (2001) (Supp.2002).[17] The Appellants argue that the circuit court should have afforded them additional time to meet the filing requirements of the MPLA as opposed to granting the harsh sanction of dismissal. We agree.

The instant case is similar to *Gray* in that the Appellants in this case did not characterize their action as falling within the MPLA. In this regard, we commented in *Gray* that

in the present case, the plaintiff filed the civil action and did not characterize the action as one falling within the realm of the Medical Professional Liability Act. Thus, under the particular circumstances of this case, dismissal appears to be a disproportionately harsh sanction. Given the newness of the statute and the approach taken by the Florida courts, as reviewed above, we do not believe that the Appellant's case should have been dismissed. We find that the Appellant and her counsel, in good faith, made a legitimate judgment that this case should be framed as an assault and battery civil action, rather than a medical malpractice action. The Appellant therefore filed her civil action without adherence to West Virginia Code § 55–7B–6. In this situation, the defendants should be permitted to request compliance with the statutory requirements. The lower court should thereafter examine the issues raised by the defendants and require the Appellant to comply with the statute. The statute of limitations for bringing an action under West Virginia Code § 55–7B–6 should be tolled during this court assessment, and the Appellant should be provided with an additional thirty days after the court decision to comply with the provisions of the statute.

218 W.Va. at 570, 625 S.E.2d at 332.

The hospital defendants draw our attention to further comments made in the *Gray* opinion warning the bar to be diligent in complying with the MPLA even in cases where its application may be subject to some doubt. Therefore, they argue that the circuit court's dismissal of the appellants' claims was proper. Indeed, in *Gray* this Court commented that

[t]he resolution of this matter of whether the allegedly offensive action occurred within the context of rendering medical services is exceedingly fact-driven. We caution all litigants preparing a complaint in such matters to be diligent in adhering to the requirements of the Medical Professional Liability Act where the healthcare provider's action could possibly be construed as having occurred within the context of the rendering of health care services.

*Gray*, 218 W.Va. at 570, 625 S.E.2d at 332. Notably, however, the complaint in the instant action was filed on June 2, 2003, while this Court's opinion in *Gray*, warning plaintiffs to adhere to the MPLA in close cases, was not handed down until November 30, 2005. Obviously, then, the Appellants in the instant case could not have been guided by the *Gray* decision.[18] Additionally, we note

---

**15.** *See infra* note 9. We note that the Appellants' amended complaint will relate back to the date of the original complaint. *See* W. Va. R. Civ. Pro. 15(c)(2) ("An amendment of a pleading relates back to the date of the original pleading when: ... the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."). Ac-

cordingly, this lawsuit will remain governed by the 2001 version of the MPLA. *See infra* note 1.

**16.** *See infra* note 2.

**17.** *See infra* note 1.

**18.** In *Davis v. Mound View Health Care, Inc.*, 220 W.Va. 28, 640 S.E.2d 91 (2006), this Court found that the circuit court properly dismissed a medi-

that when this case was considered by the circuit court on remand following the prior appeal, the Appellants requested that they be given the opportunity to comply with the MPLA in the event that the circuit court found that their claims were subject thereto. Accordingly, we remand this case to afford the Appellants the opportunity to amend their complaint and otherwise comply with the MPLA.

## IV.

## CONCLUSION

For the reasons stated in this opinion, we find that the circuit court was correct in concluding that the claims alleged by the Appellants against the defendant hospitals must be asserted under the MPLA, and we therefore affirm that portion of the circuit court's order of March 14, 2006. However, we find the circuit court's dismissal of the Appellants' claims to be unduly harsh, and therefore reverse that portion of the ruling of the circuit court and remand this case to afford the Appellants the opportunity to amend their complaint and otherwise comply with the MPLA.

Affirmed in part, reversed in part, and remanded.

Justice STARCHER concurs in part, and dissents in part, and reserves the right to file a separate opinion.

Justice BENJAMIN concurs and reserves the right to file a concurring opinion.

STARCHER, J., concurring, in part, and dissenting, in part.

(Filed December 26, 2007)

It is axiomatic that both the Legislature and the Court are constitutionally empowered to alter the common law. Courts amend the common law narrowly and incrementally, on a case-by-case basis and usually over many years. But the Legislature, when changing the common law, often makes drastic statutory changes in response to real or perceived crises, and often without a clear understanding of the impact those changes might have on individual cases. When the crises pass or are proven illusory, the Legislature is rarely impelled to repeal the statutes, and so statutes sometimes exist that address a non existent problem. This means that cookie-cutter Legislative enactments intended to "fix" a problem with the common law often end up creating absurd conundrums—or worse, end up trampling upon constitutional rights—when applied to facts in a courtroom.

The Medical Professional Liability Act, *W.Va.Code*, 55–7B–1 *et seq.* ("MPLA"), is just such a Legislative enactment. The MPLA was enacted to alter the common law to "fix" a perceived crisis involving medical malpractice lawsuits against the health care industry. The instant case shows how, in the context of a product liability action against medical providers, the MPLA muddles the common law and the *West Virginia Constitution* to create absurd legal situations in the courtroom.

I dissent from the majority opinion's attempt to construe MPLA, because I believe it is a monstrous, unconstitutional procedural mess. I join Chief Justice Davis's statement in footnote two, and I share her view that the MPLA requirements for providing pre-suit notice and a certificate of merit are totally unconstitutional, because they infringe upon this Court's exclusive constitutional rule-making powers. *See* 221 W.Va. at 704 n. 2, 656 S.E.2d at 454 n. 2. The MPLA blatantly tramples upon the separation of powers doctrine.

Unfortunately, only a minority of the members of this Court are currently willing to recognize the substantial constitutional problems created by the MPLA. The majority opinion was, therefore, drafted to give as limited an interpretation to the MPLA as possible, in the context of the facts of this case.

I do, however, concur and concede that the majority opinion's limited interpretation of

cal malpractice action for failure to comply with the pre-suit notice requirements of the MPLA. However, the Court noted that, because the dismissal had been without prejudice, the plaintiff

had the right to re-file pursuant to the savings statute found at W. Va.Code § 55–2–18 (2001) (Supp.2007).

the MPLA reaches a result that is palatable under standard rules of statutory construction. By the pure terms of *W. Va.Code*, 55–7B–2(e), a lawsuit against a hospital—alleging that the hospital supplied a defective product in the course of medical treatment—is still a lawsuit that concerns the rendering of "health care." Accordingly, lawyers bringing such suits must attempt to follow the arcane procedural hoops created by the MPLA.

But simply because the majority opinion can give the MPLA a logical construction, and simply because lawyers must bring product liability actions against health care providers under the procedures created by the MPLA, doesn't mean that application of the MPLA will have any meaningful, logical affect on future product liability lawsuits against health care providers. To the contrary, application of the MPLA to the instant case clearly demonstrates the absurdity of the MPLA, and demonstrates why the Legislature should exercise restraint when it attempts to meddle with centuries-old common law principles.

Product liability law traces its roots in the common law back to 1842 and the English case of *Winterbottom v. Wright*, 10 M. & W. 109, 152 Eng.Rep. 402 (Ex. 1842). In that case, the court established that at common law, a person in privity of contract with the manufacturer of a product could recover damages in tort for defects in the product. This Court appears to have first adopted product liability law principles—absent the privity requirement—into West Virginia's common law in 1902 in *Peters v. Johnson, Jackson & Co.*, 50 W.Va. 644, 41 S.E. 190 (1902). In *Peters*, we permitted a plaintiff who used a defective drug to recover tort damages from the seller of the drug, permitting recovery "when the thing used … is very dangerous to human life and injury may reasonably be expected to happen to others therefrom." 50 W.Va. at 651–52, 41 S.E. at 193.

This Court definitively adopted a common-law cause of action for strict product liability in *Morningstar v. Black and Decker Mfg. Co.*, 162 W.Va. 857, 253 S.E.2d 666 (1979). Unlike a typical common law tort action, a strict liability action involving a defective product does not focus upon the actions of the defendant. Instead, the focus is upon the product that caused the plaintiff's injuries. The question is not whether the defendant had a duty and was negligent in breaching that duty; the question is whether the product was not reasonably safe for its intended use. We held in Syllabus Point 3 of *Morningstar* that the cause of action is "designed to relieve the plaintiff from proving that the manufacturer was negligent in some particular fashion during the manufacturing process and to permit proof of the defective condition of the product as the principal basis of liability." The general test of whether a product is defective was established in Syllabus Point 4, where we stated:

In this jurisdiction the general test for establishing strict liability in tort is whether the involved product is defective in the sense that it is not reasonably safe for its intended use. The standard for reasonable safeness is determined not by the particular manufacturer, but by what a reasonably prudent manufacturer's standards should have been at the time the product was made.

We made it clear in 1979 that the product liability principles established by *Morningstar* are applicable to all manufacturers, distributors, suppliers and sellers of a defective product. The "rule applies to both the manufacturer and the seller, who are engaged in the business of selling such product which is expected to and does reach the user without substantial change in the condition in which it was sold." 162 W.Va. at 888 n. 22, 253 S.E.2d at 683 n. 22.

The hospitals in the instant case argued that they are exempt from the requirements of *Morningstar*, and cannot be held liable for supplying patients with sutures that were not reasonably safe for their intended use. The hospitals shotgunned several arguments at the circuit court, but essentially, the hospitals argued that (a) they do not sell sutures to patients, (b) they do not distribute sutures to patients, (c) hospitals, not the patients, are the end users of sutures, and (d) sutures are an incidental part of the vast panoply of health care services provided by hospitals.

The majority opinion side-stepped the hospitals' arguments, and focused entirely upon the notice requirements of the MPLA.

However, the hospitals' arguments are likely to be repeated in the future, and in the context of the MPLA. Unfortunately for medical providers, the modern trend is to hold medical providers liable for selling, distributing, or using defective products in the course of treating patients. Just as unfortunately, strict product liability principles and the MPLA mix together like oil and water.

There is nothing new or novel in the hospitals' arguments about medical providers being exempt from products liability law. Since the 1970s, hospitals and doctors have argued that they are not common, ragamuffin retailers of products, but are healers of the sick not subject to strict products liability. Hospitals and doctors have argued they were "mere conduits" in the distribution of medical products to patients, and should therefore be exempt from common law rules that imposed liability on distributors of non-medical products. *Carmichael v. Reitz*, 17 Cal.App.3d 958, 979, 95 Cal.Rptr. 381 (1971). The California courts led the way in exempting health care providers from strict product liability principles, largely on the basis that "[i]t needs no extended discussion to perceive that a hospital is primarily devoted to the care and healing of the sick." *Shepard v. Alexian Bros. Hosp.*, 33 Cal.App.3d 606, 611, 109 Cal.Rptr. 132 (1973). Many courts initially accepted this logic, and adopted a "hospital exemption" that presumed that defective products and equipment are merely incidental to the professional service provided by hospitals and doctors. Courts avoided imposing liability for defective products in the 1970s because "the hospital was a non-profit facility, essential to the community, which could not handle the woes of such liability." Robert R. Willis, "Strict Products Liability and Hospitals: Liability of the Modern Hospital and the use of Surgically Implanted Medical Products, Tools, and Prosthetic Devices," 34 Western.St.U.L.Rev. 191, 203 (Spring 2007).

But in recent years, the economics of the medical industry have changed, and courts have begun to swing the opposite direction.

"[A]t the start of the 21st century, both the health care and hospital industry have evolved to become one of the most profitable industries in the United States and therefore could be economically mature to handle strict products liability.... In terms of function, the hospital of just twenty years ago bears little resemblance to today's complex corporate entity ..." *Id.* at 203–04. Hospitals today are no longer non-profit, charitable affairs but are massive corporate structures.

> Between 1980 and 1996, the number of nonprofit hospitals declined by 10 percent and the number of beds they controlled declined by 15 percent. During this same period, however, the number of for-profit hospitals increased by 40 percent and the number of beds they controlled increased by 57 percent.

Helmut K. Anheier and Jeremy Kendall, *Third Sector Policy at the Crossroads: An International Non–Profit Analysis*, 23 (Routledge 2001). Further, hospitals and doctors are no longer "primarily devoted to the care and healing of the sick" as they were 30 years ago when the hospital exemption was created, but are now also devoted to maximizing shareholder and individual wealth.

> Health care in the United States is a trillion-dollar industry. Even small players in the industry are fairly large by the standards of many other industries. A modest group practice of five physicians can generate revenues of $3 million or more annually (more than the annual revenue of a typical McDonald's franchise). A community hospital can generate revenues of $100 million (more than the annual revenue of some major-league baseball teams), and some teaching hospitals have revenues exceeding $500 million annually (roughly twice the 1999 net revenue of the Internet auction site eBay).

David Dranove, *The Economic Evolution of American Health Care: From Marcus Welby to Managed Care*, 93 (Princeton U. Press 2000).

In recognition of this change in the medical system, the drafters of the *Restatement of the Law* have recently concluded that hospitals and doctors can, and should, be held

liable for defectively manufactured medical products distributed to patients. The latest iteration of the *Restatement Third* says:

A retail seller or other distributor of a prescription drug or medical device is subject to liability for harm caused by the drug or device if:

(1) at the time of sale or other distribution the drug or medical device contains a manufacturing defect..; or

(2) at or before the time of sale or other distribution of the drug or medical device the retail seller or other distributor fails to exercise reasonable care and such failure causes harm to persons.

*Restatement Third, Torts: Products Liability* § 6(e) (1998).

In this case, the plaintiffs' focus is not upon the actions of any health care provider—that is, whether any provider violated any relevant standard of care. Instead, the focus is upon the allegedly defective product sold to/supplied to/distributed to/used upon the patient in the course of surgery. The question upon which the jury will be instructed is, were the Vicryl sutures not reasonably safe for their intended use? If the answer by the jury is "yes," then the purposes of strict products liability law will be met. The injured plaintiffs—who were usually injured while lying asleep on a surgical table, and were ultimately powerless to protect themselves against the defective product—will not have to bear their losses alone, but will be fully compensated by the sellers, distributors and manufacturers of the defective sutures. The sellers, distributors and manufacturers will be able to distribute their losses, initially, among themselves according to their degrees of fault, if any (and, in the absence of any fault, will be entitled to complete indemnification for all of their damages). *See* Syllabus Point 1, *Hill v. Joseph T. Ryerson & Son, Inc.*, 165 W.Va. 22, 268 S.E.2d 296 (1980) ("A seller who does not contribute to the defect in a product may have an implied indemnity remedy against the manufacturer of the product, when the seller is sued by the user."). In the long term, the losses of the sellers, distributors and manufacturers can be incorporated into the price of the product and distributed among all future customers.

And, most importantly, by allowing a jury to impose liability, the sellers, distributors and manufacturers will be encouraged to repair and eliminate the defect, and hopefully be deterred from using defective sutures in the future.

The majority opinion concludes that the MPLA applies in this case because it is a lawsuit involving the provision of "health care." But, when the jury is finally instructed on its burden of proof, the application of the MPLA to this case will change nothing. The portion of the MPLA that sets forth the elements of proof, *W.Va.Code*, 55–7B–3, only establishes a burden of proof in cases where the plaintiff alleges that an injury "resulted from the failure of a health care provider to follow the accepted standard of care." We recently found that "the MPLA is in derogation of the common law and its provisions must generally be given a narrow construction." *Phillips v. Larry's Drive–In Pharmacy, Inc.*, 220 W.Va. 484, 492, 647 S.E.2d 920, 928 (2007). "Where there is any doubt about the meaning or intent of a statute in derogation of the common law, the statute is to be interpreted in the manner that makes the least rather than the most change in the common law." *Id.*, Syllabus Point 5. So, strictly construing *W. Va.Code*, 55–7B–3, it clearly has no application to the instant case. The plaintiffs' case centers upon whether the hospitals supplied a product that was not reasonably safe for its intended use, not whether the hospitals failed to follow any accepted standard of care.

The absurdity of this case, as the majority opinion says the MPLA mandates, is that the plaintiffs must jump through several pointless procedural hoops before getting their case heard by a jury. They must still comply with the MPLA and mail each defendant a notice telling them that they are about to be sued—even though the defendants already know that, because they were served with complaints in 2003. But, while the majority opinion plainly and clearly says that the MPLA applies in this case, the end result is that the MPLA won't do much to change the jury's verdict in each plaintiff's case. The only impact the MPLA might have is to deprive injured plaintiffs of their rightful

damages, by capping the damages that can be recovered at an arbitrary amount that has no relationship to the evidence. *See W.Va. Code*, 55–7B–8. *But see, Riggs v. West Virginia University Hospitals*, 221 W.Va. 646, 656 S.E.2d 91 (2007) (Starcher, J., dissenting) (pointing out that *W.Va.Code*, 55–7B–8 applies only to liability "based on health care services rendered ... to a patient."). And, as I and other members of this Court have discussed before, those caps on damages are also blatantly unconstitutional. *See, e.g., Verba v. Ghaphery*, 210 W.Va. 30, 37, 552 S.E.2d 406, 413 (2001) (Starcher, J., dissenting).

In conclusion, I respectfully concur with the majority opinion's logical, narrow reading of the MPLA—even though the end result of the application of the MPLA to the instant case is nothing more than additional delay and expense for the parties. I dissent to express my hope that, in the future, the Court or the Legislature will recognize the absurd and unconstitutional effects of the MPLA and either strike down or repeal the Act in its entirety.