**IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA**

2023 Fall Term

_____

No. 22-ICA-233

_____

**FILED**

**November 15, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

JAMES ATKINSON,
Plaintiff Below, Petitioner,

v.

NCI NURSING CORPS. and MEDTOX LABORATORIES, INC.,
Defendants Below, Respondents.

_____

Appeal from the Circuit Court of Harrison County
Honorable Thomas A. Bedell, Judge
Civil Action No. 22-C-130-2

REVERSED AND REMANDED

_____

Submitted: October 11, 2023
Filed: November 15, 2023


Jeffrey M. Strange, Esq.
Booth & Strange
Clarksburg, West Virginia
Counsel for Petitioner

Charles R. Bailey, Esq.
Justin C. Taylor, Esq.
Bailey & Wyant, PLLC
Charleston, West Virginia
Counsel for Respondent NCI
Nursing Corps.


CHIEF JUDGE GREEAR delivered the Opinion of the Court.

GREEAR, Chief Judge:

Petitioner, James Atkinson appeals the October 31, 2022, order of the Circuit Court of Harrison County granting Respondent NCI Nursing Corps.' ("NCI") *Motion to Dismiss*. Mr. Atkinson contends that the circuit court erred in determining that he was a "patient" of NCI under West Virginia Code § 55-7B-2 (2022) of the Medical Professional Liability Act ("MPLA"), and in dismissing his claims for failure to comply with the pre-suit notice required by West Virginia Code § 55-7B-6 (2003). The primary issue for consideration by this Court is if Mr. Atkinson's claims against NCI fall under the MPLA. As discussed more fully below, we find that Mr. Atkinson was not a patient of NCI and, thus, his claims are not subject to the MPLA. Accordingly, we reverse the circuit court's October 31, 2022, order and remand this case for further proceedings consistent with this opinion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On July 14, 2020, Mr. Atkinson, a coal mine belt supervisor and eighteen year employee of Harrison Coal Company ("HCC"), was randomly selected[1] to submit to a drug and alcohol screening administered by NCI nurse/technician, James Miller (hereinafter "nurse"). As part of the screening, Mr. Atkinson was given a cup by the nurse

---

[1] Mr. Atkinson averred, in his complaint, that his name was randomly selected by NCI. The screening took place "on the property" of HCC.

and instructed to go to a designated bathroom and provide a urine sample, which he handed to the nurse upon completion. The nurse then observed the sample was in the proper temperature range, split it into two vials, and sealed both vials with labels. Thereafter the vials were placed in a sealed evidence bag, which was placed within a mailing envelope, and mailed to Respondent MedTox Laboratories, Inc. ("MedTox").[2] MedTox conducted the urinalysis of the sample, which showed the presence of "marijuana (THC) metabolite" in the amount of 32 ng/ml (nanograms per milliliter).

Upon receipt of these test results, HCC suspended Mr. Atkinson without pay and, shortly thereafter, terminated his employment. Further, Mr. Atkinson's associated mining certifications were suspended by the West Virginia Office of Miners' Health, Safety and Training ("WVOMHST"). Despite the screening results, Mr. Atkinson alleged that he "did not ingest any illegal drugs or anything else" that violated the rules and regulations of the WVOMHST and demanded that the split sample of his urine be tested. The split sample was then sent to Alere Laboratory, who conducted a test. That test also showed a positive result for "THCA 24 NG/ML."

Thereafter, on his own initiative Mr. Atkinson voluntarily submitted to a hair follicle test. On August 3, 2020, he went to the Clarksburg MedExpress and had 1.5 inches

---

[2] While MedTox was a named defendant in the proceedings below, it has not participated in this appeal.

of his hair harvested. This hair follicle test was intended to show the presence of any illegal drugs, if any, in his bloodstream during the approximately thirty days prior to August 3, 2020. The test, paid for by Mr. Atkinson, was documented as compliant with all appropriate lab protocols, and returned a negative result for all tested drugs, including marijuana.

Mr. Atkinson later learned of another test method that could be used to test for the presence of illegal drugs over a longer period of time. On October 6, 2020, Mr. Atkinson returned to MedExpress and had an approximately six-inch sample of hair harvested for analysis at Expertox Laboratory in Winter Park, Florida. Results from that test covered approximately a one-year timeframe and again showed negative for all twelve drugs tested, including marijuana.

In a separate proceeding, Mr. Atkinson protested the WVOMHST suspension of his mining certifications. During that process, the NCI nurse who conducted the random drug screening testified that he did not conduct the drug screening in accordance with 49 C.F.R. § 40.33(a) and (e), which require that parties collecting urine samples from miners subscribe to a mandated list-serve and receive refresher training at least every five years. The nurse also testified that he did not have any documentation showing that he met the requirements set forth in 49 C.F.R. § 40.33(g), which is required in order for an individual to be permitted to act as a collector in the drug testing program. Mr. Atkinson alleged that this failure automatically rendered the drug screen results "null

and void." However, NCI and MedTox did not void or otherwise disqualify the results of the urinalysis.

On July 18, 2022, Mr. Atkinson filed the underlying complaint asserting claims for "professional malpractice" (Count I), negligence (Count II), violation of statutes (Count III), and sought punitive and other damages. On August 29, 2022, NCI filed its *Motion to Dismiss* pursuant to Rules 12(b)(1) and 12(b)(6) of the West Virginia Rules of Civil Procedure. In its *Motion*, NCI alleged that Mr. Atkinson's claim "relate[d] to and stem[ming] from his [p]rofessional [m]alpractice claims asserted in Count 1" of his complaint was an MPLA claim and subject to the pre-suit notice requirements of West Virginia Code § 55-7B-6.

On October 31, 2022, the court entered an order granting NCI's *Motion to Dismiss*. Specifically, the court found that Mr. Atkinson failed to comply with the requirements of the MPLA deemed applicable thereto given the determination that NCI was "a [health care] provider pursuant to the MPLA and their services rendered with respect to Plaintiff qualify as [health care]." It is from the October 31, 2022, order that Mr. Atkinson now appeals.

4

## II. STANDARD OF REVIEW

"Appellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo*." Syl. Pt. 2, *State ex. rel McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 461 S.E.2d 516 (1995). Moreover, "[t]he trial court, in appraising the sufficiency of a complaint on a Rule 12(b)(6) motion, should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Syl. Pt. 3, *Chapman v. Kane Transfer Co., Inc.*, 160 W. Va. 530, 236 S.E.2d 207 (1977). On appeal of a dismissal based on granting a motion pursuant to West Virginia Rules of Civil Procedure 12(b)(6), the allegations of the complaint must be taken as true. Syl. Pt. 1, *Wiggins v. Eastern Associated Coal Corp.*, 178 W. Va. 63, 357 S.E.2d 745 (1987).

Further, because we must decide whether the circuit court was correct in applying the MPLA to this matter, our review is further guided by the Supreme Court of Appeals of West Virginia's ("SCAWV") recognition, in syllabus point one of *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995), that "[w]here the issue on appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." With these standards in mind, we now consider the issues raised on appeal.

### III. DISCUSSION

On appeal, Mr. Atkinson advances three assignments of error, which are interrelated and call for this Court to determine one question: Did the circuit court err in finding that Mr. Atkinson's claims fall under the MPLA. Here, Mr. Atkinson alleges that because the actions and services performed by NCI were not "health care" as defined by West Virginia Code § 55-7B-2 of the MPLA, his claims do not fall under the MPLA.

In order to make such a determination we must examine the statutory definitions contained within the MPLA, at West Virginia Code § 55-7B-2. The SCAWV has reasoned that "[t]he primary rule of statutory construction is to ascertain and give effect to the intention of the Legislature." Syl. Pt. 8, *Vest v. Cobb*, 138 W. Va. 660, 76 S.E.2d 885 (1953). However, the SCAWV has recognized that "[i]t is not for this Court arbitrarily to read into [a statute] that which it does not say. Just as courts are not to eliminate through judicial interpretation words that were purposely included, we are obliged not to add to statues something the Legislature purposely omitted." *Phillips v. Larry's Drive-in Pharmacy, Inc.*, 220 W. Va. 484, 492, 647 S.E.2d 920, 928 (2007).

In *Phillips*, the SCAWV reasoned that its:

> examination of the MPLA is guided, at all times, by the recognition that the Act alters the 'common law and statutory rights of our citizens to compensation for injury and death[.]' W. Va. Code § 55-7B-1. In other words, by its own terms, the entire MPLA is an act designed to be in derogation of the common law.

6

*Id* at 492, S.E.2d at 928. Such a finding supports the SCAWV's "long-standing maxim that '[s]tatutes in derogation of the common law are strictly construed.'" *Keller v. James*, 63, W.Va. 139, 59 S.E. 939 (1907). In *Phillips*, the SCAWV concluded that

> where there is any doubt about the meaning or intent of a statute in derogation of the common law, the statute is to be interpreted in the manner that makes the least rather than the most change in the common law. Furthermore, because W. Va. Code, 55-7B-1 specifies that the MPLA was enacted to alter the 'common law . . . rights of our citizen to compensation for injury and death,' the MPLA is in derogation of the common law and its provisions must generally be given a narrow construction.

*Id*. at 493, S.E.2d at 929.

> Moreover, the SCAWV has held that:

> [t]he failure to plead a claim as governed by the Medical Professional Liability Act, W. Va. Code § 55-7B-1, *et seq.*, does not preclude application of the Act. Where the alleged tortious acts or omissions are committed by a health care provider within the context of the rendering of 'health care' as defined by W. Va. Code § 55-7B-2(e) (2006) (Supp. 2007), the Act applies regardless of how the claims have been pled.

Syl. Pt. 4, *Id*. citing Syl. Pt. 4, *Blankenship v. Ethicon, Inc.*, 221 W. Va. 700, 656 S.E.2d 451 (2007). Where the alleged offensive action was committed within the context of rendering of "health care," the statute applies. *Id.* at 707, 656 S.E.2d at 458. Where the action was outside the realm of the provision of "health care," the statute does not apply. *Id.* at 707, 656 S.E.2d at 458.

Under West Virginia Code § 55-7B-2(m)(2002), "'[p]atient' means a natural person who receives or should have received health care from a licensed health care provider under a contract, expressed or implied." Thus, we must determine whether "health care" was provided by NCI in the act of collecting a urine sample for a drug screen.

"Health care" is defined in West Virginia Code § 55-7B-2(e)(2022), which provides, in pertinent part, that:

> For the purposes of this article, the following words shall have the meanings ascribed to them in this section unless the context clearly indicates a different meaning:
> (e) "Health care" means:
> (1) Any act, service, or treatment provided under, pursuant to, or in the furtherance of a physician's plan of care, a health care facility's plan of care, medical diagnosis, or treatment;
> (2) Any act, service, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider or person supervised by or acting under the direction of a health care provider or licensed professional for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement, including, but not limited to, staffing, medical transport, custodial care, or basic care, infection control, positioning, hydration, nutrition, and similar patient services; and
> (3) The process employed by health care providers and health care facilities for the appointment, employment, contracting, credentialing, privileging, and supervision of health care providers.[3]

---

[3] Subsection (e)(3) appears to deal with internal mechanisms of health care providers and health care facilities and is inapplicable to this analysis.

When analyzing subsection (e)(1) it is unclear whether the provision creates four or two categories of consideration. Under the four category consideration, "health care" is read to mean any of the following:

> (1) any act, service, or treatment provided under, pursuant to, or in the furtherance of a physician's plan of care; or
>
> (2) any act, service, or treatment provided under, pursuant to, or in the furtherance of a health care facility's plan of care; or
>
> (3) any act, service, or treatment provided under, pursuant to, or in the furtherance of medical diagnosis; or
>
> (4) any act, service, or treatment provided under, pursuant to, or in the   furtherance of or treatment.

Under the two category consideration, "health care" is read to mean either:

> (1) any act, service, or treatment provided under, pursuant to, or in the furtherance of a physician's plan of care; or
>
> (2) any act, service, or treatment provided under, pursuant to, or in the furtherance of a health care facility's plan of care, medical diagnosis, or treatment.

Regardless of whether "health care" is a four category or two category consideration, we conclude that the actions of NCI below do not constitute "health care" under West Virginia Code § 55-7B-2(e)(1). We can easily dismiss the consideration that conducting a uranalysis drug screen test was an act, service or treatment provided in furtherance of either a physician or heath care facility's "plan of care." First, no physician or health care facility took part in the collection of Mr. Atkinson's urine, which took place

9

at Mr. Atkinson's workplace. Second, there was no "plan of care" for Mr. Atkinson or treatment provided to or planned for Mr. Atkinson by NCI – just simply the collection of urine for a drug and alcohol screening. Thus, we are left to determine if collecting a urine sample and completing a uranalysis is an act, service, or treatment provided under, pursuant to, or in furtherance of a medical diagnosis.

The term "medical diagnosis" is not defined by the MPLA. However, "medical diagnosis" is a term of art that has a specific and particular meaning relating to the identification and alleviation of a physical or mental illness, disease, or defect. *See Hill v. Wadsworth-Rittman Area Hospital*, 185 Ohio App.3d 788, 925 N.E.2d 1012 (2009*); See Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245 (2004). While the uranalysis was designed to identify the presence of various substances in Mr. Atkinson's urine, the test itself did not identify any physical or mental illness, disease, or condition.

In the matter before us, no evidence has been presented that a medical diagnosis was sought, exists, or was given to Mr. Atkinson. He was simply advised what substances were present in his urine sample. Additionally, there is no evidence that any employee of NCI was even qualified to render a medical diagnosis pursuant to the applicable rules and statutes regarding scope of medical practice in West Virginia. *See* West Virginia Code § 30-7-1 to -20 (2018), and West Virginia Code § 30-3-1 to -20 (1980). Thus, as the acts performed by NCI cannot be determined to have been provided in

10

furtherance of a medical diagnosis, we find that Mr. Atkinson did not receive "health care" pursuant to the terms of West Virginia Code § 55-7B-2(e)(1).

We must also consider whether the services provided to Mr. Atkinson could fall under the definition of "health care" pursuant to subsection West Virginia Code § 55-7B-2(e)(2) – an act, service, or treatment by a "health care" provider to a patient during the patient's medical care, treatment, or confinement. Here, there was an "act or service" (collection of a urine sample for the purpose of detecting drugs or alcohol), provided to Mr. Atkinson, which was performed by "any health care provider."[4] However, in order to be "health care" under the MPLA, such act had to be provided to Mr. Atkinson by a health care provider during his medical care.[5]

---

[4] West Virginia Code § 55-7B-2(g) defines "health care provider" as "a person, partnership, corporation, professional limited liability company, health care facility, entity, or institution licensed by, or certified in, this state or another state, to provide health care or professional health care services, including, but not limited to, a physician, osteopathic physician, physician assistant, advanced practice registered nurse, hospital, health care facility, dentist, registered or licensed practical nurse, optometrist, podiatrist, chiropractor, physical therapist, speech-language pathologist, audiologist, occupational therapist, psychologist, pharmacist, technician, certified nursing assistant, emergency medical service personnel, emergency medical services authority or agency, any person supervised by or acting under the direction of a licensed professional, any person taking actions or providing service or treatment pursuant to or in furtherance of a physician's plan of care, a health care facility's plan of care, medical diagnosis or treatment; or an officer, employee, or agent of a health care provider acting in the course and scope of the officer's, employee's or agent's employment." We believe NCI would fall under the definition provided.

[5] There is no dispute that Mr. Atkinson was not confined during any time frame that "health care" services were allegedly provided.

Medical care is not defined within the MPLA. Further, no case law exists which defines medical care. The SCAWV has held that "[e]ach word of a statute should be given some effect and a statute must be construed in accordance with the import of its language. Undefined words and terms used in a legislative enactment will be given their common, ordinary and accepted meaning." *Osborn v. U.S.*, 211 W. Va. 667, 674, 567 S.E.2d 677, 684 (2022)(citing Syllabus point 6, in part, *State ex rel. Cohen v. Manchin,* 175 W. Va. 525, 336 S.E.2d 171 (1984)).

Merriam-Webster's Dictionary defines "medical" as: of, relating to, or concerned with physicians or the practice of medicine. *Medical*, Merriam-Webster Collegiate Dictionary (11th ed. 2003). Black's Law Dictionary defines "care" as serious attention. *Care*, Black's Law Dictionary (11th ed. 2019). Thus, we find that plain and commonly accepted meaning of medical care relates to or concerns serious attention by a physician or the practice of medicine. Here, no physician gave Mr. Atkinson serious attention, i.e., care. No medical care was provided to Mr. Atkinson by anyone at NCI. NCI simply acted as an agent assisting in the collection of the urine sample, preservation of the sample, and transport of that sample to the appropriate laboratory for testing. Accordingly, we find that NCI did not provide medical care to Mr. Atkinson, under West Virginia Code § 55-7B-2(e)(2).

In summary, we conclude that under the limited facts and circumstances of this case, in submitting to a urinalysis, not ordered by any physician for diagnosis and/or

treatment, and not performed at a health care facility, Mr. Atkinson did not receive "health care" from NCI under West Virginia § 55-7B-2, (e)(1) or (e)(2),[6] and the application of the MPLA is not triggered.[7]

We find this situation analogous to a physician performing record reviews or independent medical evaluation of an individual. In that situation, the SCAWV has reasoned that a "physician who undertakes to evaluate prospective employee's medical records for the employer lacks sufficient professional relationship with employee to support malpractice action." Syl. Pt., *Rand v. Miller*, 185 W. Va. 705, 408 S.E.2d 655 (1991); *See also Kirk v. Anderson*, 496 P.3d 66 (2021) (holding that there is not physician-patient relationship between IME examiner and claimant); *See also Smith v. Radecki*, 238 P.3d 111 (2012) (physicians conducting IME's at the behest of third parties assume a fundamentally different role from a diagnosing or treating physician). Accordingly, based on the foregoing, we find that Mr. Atkinson's claims fall outside the confines of the MPLA, as he did not receive "health care" and was not a patient of NCI.

Further, we are not persuaded by NCI's argument that simply because Mr. Atkinson titled his claims against NCI in Count 1 complaint as "profession malpractice,"

---

[6] There is not dispute that West Virginia § 55-7B-2(e)(3) is not applicable to the facts of the underlying case, as it does not involve appointment, employment, contracting, credentialing, privileging, and supervision of health care providers or health care facilities.

[7] If "health care" was not provided, then Mr. Atkinson was not a patient within the definition of the MPLA. See West Virginia Code § 55-7B-2(m).

that the MPLA is applicable. Mr. Atkinson's description of his claims is not determinative of whether the claim is proper under the MPLA. As the SCAWV found in *Blankenship*, "[w]here the action in question was outside the realm of the provision of ['health care,'] the statute does not apply." *Blankenship*, 221 W. Va. at 707. Accordingly, we find that the circuit court erred in its determination that the MPLA applied to Mr. Atkinson's claims herein.

## IV. CONCLUSION

Accordingly, the October 31, 2022, order of the Circuit Court of Harrison County is hereby reversed, and this matter is remanded to the Circuit Court of Harrison County for further actions consistent with this decision.

Reversed and Remanded.