647 S.E.2d 920

**August Eugene PHILLIPS and Cheryl Phillips, his wife, Petitioners**

v.

**LARRY'S DRIVE–IN PHARMACY, INC., a West Virginia corporation, Respondent.**

**No. 33194.**

Supreme Court of Appeals of West Virginia.

Submitted March 13, 2007.

Decided June 28, 2007.

---

Frank M. Armada, J. Robert Rogers, William DeForest Thompson, Armada, Rogers & Thompson, Hurricane, for Petitioners.

G. Nicholas Casey, Webster J. Arceneaux, III, Michael J. Folio, Charleston, for Amicus Curiae Rite Aid of West Virginia.

Philip A. Reale, Charleston, for Amicus Curiae West Virginia Pharmacists Association, Inc.

Jay M. Potter, Schumacher, Francis & Nelson, Charleston, for Respondent.

Jeffrey M. Wakefield, Erica M. Baumgras, Jaclyn A. Bryk, Flaherty, Sensabaugh & Bonasso, Charleston, for Amicus Curiae National Association of Chain Drug Stores, Inc.

STARCHER, Justice:

In this certified question from the Circuit Court of Boone County, we are asked to examine a case where a plaintiff alleges that

a pharmacy negligently filled a prescription. The question from the circuit court asks us to consider whether a pharmacy is a "health care provider" entitled to rely upon the protections of the 1986 Medical Professional Liability Act.

After careful consideration of the briefs of the parties and the *amici curiae*,[1] the arguments, and all matters of record, we conclude that a pharmacy is not a health care provider as defined by the Act.

## I.

### Facts & Background

In December 2001, plaintiff August Eugene Phillips visited his doctor, Sriramloo Kesari, complaining of pain and swelling in his left foot. Dr. Kesari diagnosed the plaintiff as suffering from acute gouty arthritis, and wrote a prescription for Colchicine tablets. The plaintiff was also told to use the medication if the symptoms appeared in the future.

On December 3, 2001, the plaintiff drove to defendant Larry's Drive-In Pharmacy, Inc. (hereafter, "the pharmacy"), and presented the prescription. The pharmacy filled the Colchicine prescription, and the instructions printed on the bottle by the pharmacy matched exactly those written on the prescription by the doctor: "take 1 tablet every hour until pain stops or diarrhea starts or nausea." Neither the doctor's prescription nor the pharmacy's printed instructions stated an upper limit on the number of tablets that the plaintiff could take during any given time period.

In February 2002, the plaintiff began to again suffer the symptoms of acute gouty arthritis, and for three days he took Colchicine in accordance with the instructions on the bottle. But on February 13, 2002, the plaintiff began to experience stroke-like symptoms and was taken to a hospital. Doctors determined that the plaintiff was suffering from Colchicine toxicity and poisoning that had severely and permanently damaged the plaintiff's kidneys. The record indicates that the plaintiff is now required to undergo routine kidney dialysis, and will do so for the remainder of his life.

The plaintiff and his wife Cheryl filed the instant lawsuit against Dr. Kesari and defendant Larry's Drive-In Pharmacy, Inc., in March 2003. The lawsuit alleged that Dr. Kesari, *inter alia*, negligently prescribed Colchicine for the plaintiff without specifying any limit on the number of tablets that could be taken during some defined time period. The lawsuit further alleged that Larry's Drive-In Pharmacy, *inter alia*, negligently filled the prescription by failing to clarify Dr. Kesari's instructions to specify a maximum daily dosage, and in failing to recognize the potential toxicity of the prescribed dose of Colchicine.

Dr. Kesari later settled with the plaintiffs, and he was dismissed from the lawsuit with prejudice.

Through the course of discovery, counsel for the pharmacy asserted that the case should proceed according to the requirements of the West Virginia Medical Professional Liability Act, *W.Va.Code*, 55–7B–1 to – 12 ("the MPLA").

The plaintiffs subsequently filed a pre-trial motion in limine to prevent the pharmacy from relying upon the MPLA. Specifically, the plaintiffs argued that pharmacies like the defendant are not encompassed by the definition of "health care provider[s]" who are protected by the MPLA. The statute states:

"Health care provider" means a person, partnership, corporation, facility or institution licensed by, or certified in, this state or another state, to provide health care or professional health care services, including, but not limited to, a physician, osteopathic physician, hospital, dentist, registered or licensed practical nurse, optometrist, podiatrist, chiropractor, physical therapist, or psychologist, or an officer, employee or agent thereof acting in the course and

1. We acknowledge the assistance of the National Association of Chain Drug Stores, Rite Aid of West Virginia, Inc., and the West Virginia Pharmacists Association, Inc., who submitted *amicus curiae* briefs in support of the defendant's position.

scope of such officer's, employee's or agent's employment.

*W.Va.Code*, 55–7B–2(c) [1986].[2]

As support for the plaintiffs' interpretation of the MPLA, counsel for the plaintiffs introduced affidavits by four individuals who were members of the Legislature when the MPLA was enacted in 1986.[3] Further, J. Robert Rogers, counsel for the plaintiffs, offered his own affidavit about the intent of the Legislature in enacting the MPLA, because he too was a member of the West Virginia Senate in 1986. These five individuals indicated that they were members of a ten-member conferee committee (composed of five delegates and five senators) charged with conferring and reaching an agreement between the House of Delegates and the Senate upon the language of the MPLA prior to its passage. All five of these members of the 1986 Legislature stated that lobbyists representing pharmacies and pharmacists were present when the MPLA was being discussed and enacted, but that these lobbyists insisted that pharmacists and pharmacies did not want to be covered by the MPLA. Accordingly, these five former members of the Legislature contended that pharmacists and pharmacies were not intended to be encompassed by the definition of "health care provider" in the MPLA.

The plaintiff offered the circuit court two further reasons why pharmacies are not covered by the MPLA. First, the plaintiff pointed out that *W.Va.Code*, 55–7B–2 [1986] has been revised twice since 1986 (in 2003 and 2006), and neither time has the Legislature modified the definition of "health care provider" to specifically include pharmacists and pharmacies. Second, the plaintiff stated that in 2005[4] two bills were introduced in the Legislature to amend *W.Va.Code*, 55–7B–2 to include pharmacists and pharmacies, but neither of the bills was approved.

At a hearing on March 16, 2006, the circuit court denied the plaintiffs' motion in limine

and ruled that pharmacies were included within the definition of "health care provider" in the MPLA. The circuit court declined to consider the affidavits by the former legislators. However, in an order dated June 2, 2006, the circuit court stayed all proceedings and certified the following question to this Court:

> In a civil action filed against a defendant licensed pharmacy for allegedly having negligently dispensed medication, is the pharmacy a "health care provider", as defined by West Virginia Code § 55–7B–2(c)?
>
> Answer of the Circuit Court: Yes.

We agreed to review the certified question on September 21, 2006.

## II.

### *Standard of Review*

It is well settled that this Court's review of a circuit court's answer to a certified question that interprets a statute is *de novo*. As we said in Syllabus Point 1 of *Gallapoo v. Wal–Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996), "The appellate standard of review of questions of law answered and certified by a circuit court is *de novo*." Also, the certified question before us requires us to construe the Medical Professional Liability Act. We have held that "[w]here the issue … is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995).

## III.

### *Discussion*

The question certified by the circuit court asks us to interpret the 1986 Medical Professional Liability Act.

However, the evidence introduced by the plaintiffs in the circuit court raises an addi-

---

**2.** This statute, originally enacted in 1986, was amended in 2003 and 2006. The subparagraph defining "health care provider" may now be found at *W.Va.Code*, 55–7B–2(g) [2006]. However, no substantive changes were made to the definition that affect the case before the Court.

**3.** The record includes affidavits from Truman Chafin, Robert C. "Chuck" Chambers, Michael Shaw, and Larry Tucker.

**4.** House Bill 2871 and Senate Bill 491 were introduced in each respective chamber, but neither was reported out of committee.

tional, preliminary question: may a court consider the post-enactment testimony of a former member of the Legislature regarding the intent behind the entire Legislature's enactment of a statute? [5]

We stated in Syllabus Point 1 of *Cogan v. City of Wheeling*, 166 W.Va. 393, 274 S.E.2d 516 (1981) that, as a general rule, courts should not consider such testimony:

> Ordinarily a court cannot consider the individual views of members of the Legislature or city council which are offered to prove the intent and meaning of a statute or ordinance after its passage and after litigation has arisen over its meaning and intent.

Post-enactment statements by an individual legislator are suggestive of the Legislature's intent, and certainly might be considered when the statements "are consistent with the statutory language and legislative history." Norman J. Singer, 2A *Sutherland Statutory Construction* § 48.16 at 480 [6th Ed. 2000]. *In accord, California Teachers Assn. v. San Diego Community College Dist.*, 28 Cal.3d 692, 170 Cal.Rptr. 817, 621 P.2d 856 (1981) ("A legislator's statement is entitled to consideration ... when it is a reiteration of legislative discussion and events leading to adoption of proposed amendments rather than merely an expression of personal opinion."). Still, courts should not be placed in the position of passing upon the credibility of legislators and ex-legislators. A court should also recognize that "the understanding of one or a few members of the Legislature is not necessarily determinative of legislative intent." *Id.* "[N]o guarantee can issue that those who supported [a legislator's] proposal shared his view of its compass." *In re Marriage of Bouquet*, 16 Cal.3d 583, 589–590, 128 Cal.Rptr. 427, 546 P.2d 1371 (1976).

The plaintiffs argue that the five affidavits by members of the 1986 Legislature should have been considered by the circuit court because the affidavits do not contain statements of the legislators' opinions about the meaning of the MPLA and the legislative intent behind its adoption. Instead, the plaintiffs contend that the affidavits are merely statements of the history underlying the adoption of the MPLA.[6] We disagree.

The five affidavits of former legislators were offered by the plaintiffs in this case to prove the intent and meaning of the MPLA nearly two decades after its passage, after litigation has arisen over its meaning and intent. While the information contained in the affidavits is persuasive, the information is not corroborated by the legislative history because the Legislature failed to preserve any record of the committee meetings to which the affidavits refer. Furthermore, the affidavits go beyond reciting the history behind the MPLA's enactment and instead detail each legislator's opinion about the proper interpretation of the statute. Accordingly, we find that the circuit court did not abuse its discretion when it refused to consider these affidavits in assessing the Legis-

---

5. The question before this Court is not one of admissibility; because the issue before the circuit court was a question of law (the interpretation of the statute), we must only determine whether and to what extent a court can consider and rely upon a legislator's statements in resolving the question of law. The question also does not implicate legislative history recorded, or statements made by legislators, contemporaneously with a statute's passage. And lastly, the question is focused solely upon a legislator's testimony about the Legislature's intent and interpretation of a statute, and does not involve testimony regarding the procedures surrounding the passage of a statute.

6. As the plaintiffs argue in their brief to this Court:

> You wonder how these affiants remember such detail twenty years later? The answer is simple. The pharmacy lobbyist Richard Ste-

vens appeared before the committee and asked that pharmacies and pharmacists be excluded! At the time, the pharmacy industry was fearful of mandatory claims reporting, liability insurance coverage and what it thought would be [the] consequential financial burden of skyrocketing premiums that it had indicated it had seen the medical community suffer as part of a medical malpractice crisis. Thus, the pharmacy industry lobbied to be excluded. The Committee agreed, but not for those reasons. It was the committee's position that pharmacies were not delivering medical care. The Act was to protect medical providers and it was the committee's final opinion that the class of health care providers did not include pharmacies.... These affidavits are powerful and persuasive evidence of the legislative intent.

lature's intent behind and interpretation of the MPLA.

We now turn to the language of the MPLA, and examine whether the phrase "health care provider" in *W.Va.Code,* 55–7B–2(c) [1986] covers pharmacies.

The MPLA was enacted in 1986 with the explicit purpose of adopting "reforms in the common law and statutory rights of our citizens to compensation for injury and death," so as to encourage and facilitate the provision of the best medical care and facilities to the citizens of West Virginia. *W.Va.Code,* 55–7B–1 [1986]. The reforms contained within the MPLA are numerous, and include the creation of unique procedural guidelines for negligence actions against health care providers,[7] and limits upon the damages that may be awarded and the way those damages may be collected.[8]

The alterations to the common law and to other statutes made by the MPLA are applicable only to health care providers. The MPLA defines "health care provider" in the following manner:

"Health care provider" means a person, partnership, corporation, facility or institution licensed by, or certified in, this state or another state, to provide health care or professional health care services, including, but not limited to, a physician, osteopathic physician, hospital, dentist, registered or licensed practical nurse, optometrist, podiatrist, chiropractor, physical therapist, or psychologist, or an officer, employee or agent thereof acting in the course and scope of such officer's, employee's or agent's employment.

*W.Va.Code,* 55–7B–2(c) [1986].

The plaintiffs argue that the Court should follow the familiar statutory interpretation maxim *expressio unius est exclusio alterus,* or the express mention of one thing implies the exclusion of another. Because certain medical professions are specifically listed by the statute, but pharmacies are excluded, the plaintiffs argue this means that the Legislature intended to exclude pharmacies.

The defendant pharmacy concedes that pharmacies and pharmacists are not contained in the "including, but not limited to" list of providers covered by *W.Va.Code,* 55–7B–2(c). However, the defendant argues that *W.Va.Code,* 55–7B–2(c) should be interpreted broadly to protect any person or corporation licensed by the State "to provide health care or professional health care services."[9] Because pharmacists must be licensed by the State, and a pharmacy must employ a licensed pharmacist,[10] and because

---

7. For example, the 1986 variant of the MPLA prohibits a plaintiff from including in the complaint any "specific dollar amount or figure," *W.Va.Code,* 55–7B–5 [1986], and establishes a ten-year statute of repose, *W.Va.Code,* 55–7B–4(a) [1986].

   The 1986 enactment also sets forth several qualifications for the plaintiff's experts who will testify regarding the defendant's standard of care, including that the expert must be currently licensed to practice medicine and be "engaged or qualified in the same ... medical field as the defendant health care provider." *W.Va.Code,* 55–7B–7 [1986]. However, we later concluded that this statute is at odds with the Court's constitutional rule-making authority, and ruled that Rule 702 of the *Rules of Evidence* is the paramount authority for determining whether or not an expert witness is qualified to give an opinion. *See Mayhorn v. Logan Medical Foundation,* 193 W.Va. 42, 454 S.E.2d 87 (1994).

8. For instance, the 1986 MPLA limited the amount of damages that could be recovered for a "noneconomic loss" to $1,000,000.00, and altered the standards of joint and several liability

for a jury's verdict. *See W.Va.Code,* 55–7B–8 and –9 [1986].

   In 2003, the MPLA was substantially revised to limit the amount of damages that could be recovered in any action for a "noneconomic loss" to $250,000.00 in the case of an injury, and to $500,000.00 in the case of a wrongful death or certain permanent impairments, regardless of the number of plaintiffs or defendants. *See W.Va.Code,* 55–7B–8 [2003]. The total amount of damages recoverable from an emergency medical provider was capped at $500,000.00. *See W.Va.Code,* 55–7B–9c [2003]. The 2003 revisions also virtually eliminated joint liability for a verdict. *See* 55–7B–9 [2003].

9. In somewhat circular fashion, the MPLA defines "health care" as "any act or treatment performed or furnished ... by any health care provider[.]" *W.Va.Code,* 55–7B–2(a) [1986].

10. *See W.Va.Code,* 30–5–4 [1995] (requiring pharmacists to be "licensed"), *W.Va.Code,* 30–5–1b(23) [2005] (defining "pharmacist" as "an individual currently licensed by this state to engage in the practice of pharmacy"), and *W.Va.Code,* 30–5–3 [2001] (requiring all pharmacies to have a "pharmacist").

they are both participants in the provision of health care to sick patients, the defendant argues that pharmacies are health care providers covered by the MPLA.

The plaintiffs agree that pharmacists are clearly professionals who require advanced education, training, and licensure. However, the plaintiffs take the position that a pharmacist's area of specialty is dispensing drugs and providing drug counseling—not providing health care. The plaintiffs also point to numerous other professions like pharmacists that are subject to mandatory state licensing—such as attorneys, accountants, funeral embalmers, hearing aid dealers, barbers, dieticians, cosmetologists, and engineers—who do not provide health care and are therefore not covered by the MPLA. In other words, the plaintiffs assert that being a licensed professional, and being open to potential suits for malpractice, does not then make a pharmacist a health care provider as defined by the MPLA. More importantly, the plaintiffs assert the mere fact that a pharmacy employs a licensed pharmacist does not make the pharmacy a "health care provider" under the MPLA.

The parties have given *W.Va.Code,* 55–7B–2(c) dueling, plausible interpretations: the plaintiffs argue that pharmacies are not covered by the MPLA because they were specifically not included in the statute, and the defendant responds that the language of the statute was broadly drawn and may therefore be construed to include coverage for pharmacies. "A statute is open to construction only where the language used requires interpretation because of ambiguity which renders it susceptible of two or more constructions or of such doubtful or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning." *Sizemore v. State Farm Gen. Ins. Co.,* 202 W.Va. 591, 596, 505 S.E.2d 654, 659 (1998) (*quoting Hereford v. Meek,* 132 W.Va. 373, 386, 52 S.E.2d 740, 747 (1949)).

We begin our analysis of *W.Va.Code,* 55–7B–2(c) by laying out our standards for statutory construction.

"The primary rule of statutory construction is to ascertain and give effect to the intention of the Legislature." Syllabus Point 8, *Vest v. Cobb,* 138 W.Va. 660, 76 S.E.2d 885 (1953).

However, "[i]t is not for this Court arbitrarily to read into [a statute] that which it does not say. Just as courts are not to eliminate through judicial interpretation words that were purposely included, we are obliged not to add to statutes something the Legislature purposely omitted." *Banker v. Banker,* 196 W.Va. 535, 546–47, 474 S.E.2d 465, 476–77 (1996) (*citing Bullman v. D & R Lumber Company,* 195 W.Va. 129, 464 S.E.2d 771 (1995); *Donley v. Bracken,* 192 W.Va. 383, 452 S.E.2d 699 (1994)). *See also, State ex rel. Frazier v. Meadows,* 193 W.Va. 20, 24, 454 S.E.2d 65, 69 (1994) ("Courts are not free to read into the language what is not there, but rather should apply the statute as written."). Moreover, "[a] statute, or an administrative rule, may not, under the guise of 'interpretation,' be modified, revised, amended or rewritten." Syllabus Point 1, *Consumer Advocate Division v. Public Service Commission,* 182 W.Va. 152, 386 S.E.2d 650 (1989).

Furthermore, our examination of any portion of the MPLA is guided, at all times, by the recognition that the Act alters the "common law and statutory rights of our citizens to compensation for injury and death[.]" *W.Va.Code,* 55–7B–1. In other words, by its own terms, the entire MPLA is an act designed to be in derogation of the common law.

It is a long-standing maxim that "[s]tatutes in derogation of the common law are strictly construed." *Kellar v. James,* 63 W.Va. 139, 59 S.E. 939 (1907). As the leading commentator in statutory construction states:

Statutes which impose duties or burdens or establish rights or provide benefits which were not recognized by the common law have frequently been held subject to strict, or restrictive, interpretation. Where there is any doubt about their meaning or intent they are given the effect which makes the least rather than the most change in the common law.

Norman J. Singer, 3 *Sutherland Statutory Construction* § 61:1 at 217 (6th Ed. 2001). This Court has similarly concluded that, when interpreting an ambiguous statute that is contrary to the common law, the statute must be given a narrow construction. As we stated in Syllabus Points 3 and 4 of *Bank of Weston v. Thomas*, 75 W.Va. 321, 83 S.E. 985 (1914):

> 3. Statutes in derogation of the common law are allowed effect only to the extent clearly indicated by the terms used. Nothing can be added otherwise than by necessary implication arising from such terms.
> 4. The rule of construction, requiring effect to be given to all the terms used in a statute, if possible, is satisfied by assignment to them of a substantial, though limited, function or field of operation. It does not require allowance to them, of a scope of operation coextensive with their literal import.

▬▬▬ In light of these authorities, we conclude that, where there is any doubt about the meaning or intent of a statute in derogation of the common law, the statute is to be interpreted in the manner that makes the least rather than the most change in the common law. Furthermore, because *W.Va. Code,* 55–7B–1 specifies that the MPLA was enacted to alter the "common law . . . rights of our citizens to compensation for injury and death," the MPLA is in derogation of the common law and its provisions must generally be given a narrow construction.

With these standards in mind, we turn to the language of the statute.

▬▬ *W.Va.Code,* 55–7B–2(c) defines "health care provider" as one who is licensed to provide "health care or professional health care services," and gives a list of professionals and businesses intended to be covered by the MPLA. The list does not include pharmacies, and this Court has previously recognized that "[i]n the interpretation of statutory provisions the familiar maxim *expressio unius est exclusio alterius,* the express mention of one thing implies the exclusion of another, applies." Syllabus Point 3, *Man-*

chin v. Dunfee, 174 W.Va. 532, 327 S.E.2d 710 (1984). *See also, State ex rel. Riffle v. Ranson,* 195 W.Va. 121, 128, 464 S.E.2d 763, 770 (1995) ("*Expressio unius est exclusio alterius* (express mention of one thing implies exclusion of all others) is a well-accepted canon of statutory construction.") (*citing Brockway Glass Co. Inc., Glassware Div. v. Caryl,* 183 W.Va. 122, 394 S.E.2d 524 (1990); *Dotts v. Taressa J.A.,* 182 W.Va. 586, 591, 390 S.E.2d 568, 573 (1990)). The *expressio unius* maxim is premised upon an assumption that certain omissions from a statute by the Legislature are intentional. As the Court explained in *Riffle,* "[i]f the Legislature explicitly limits application of a doctrine or rule to one specific factual situation and omits to apply the doctrine to any other situation, courts should assume the omission was intentional; courts should infer the Legislature intended the limited rule would not apply to any other situation." 195 W.Va. at 128, 464 S.E.2d at 770.

The defendant argues that this Court has, on a past occasion, stretched *W.Va.Code,* 55–7B–2(c) to apply to a health care provider that was not specifically enumerated by the statute: emergency medical technicians.[11] In *Short v. Appalachian OH–9, Inc.,* 203 W.Va. 246, 507 S.E.2d 124 (1998), the Court examined an allegation that EMTs had negligently treated an infant who had stopped breathing. After determining that EMTs provide hands-on emergency medical services to patients, the Court concluded that "the definition of 'health care provider' is subject to the inclusion of emergency medical service personnel." 203 W.Va. at 250, 507 S.E.2d at 128.

The plaintiffs respond that *Short v. Appalachian OH–9, Inc.* is factually distinguishable from the instant case. The plaintiffs assert that EMTs actually lay hands on a patient, and are solely responsible for that patient's well-being during emergency situations and during transport. A pharmacy, however, does not have a hands-on independent medical relationship, but rather sees a patient only as a customer purchasing a product in a drug store after the patient has

---

11. In 2003, the Legislature expanded the definition of "health care provider" to include any

"emergency medical services authority or agency." *See W.Va.Code,* 55–7B–2(g) [2003].

visited his or her doctor and received a prescription. To paraphrase the plaintiffs' assertions at oral argument, to accept the defendant's argument would be to afford major commercial retail establishments such as Wal–Mart, Target or K–Mart with the protections of the MPLA merely because they dispensed a prescription to a customer.

■ We find that *Short v. Appalachian OH–9, Inc., supra,* is distinguishable from the instant case. First and foremost, the situation in *Short* involved a medical care provider who developed a hands-on relationship with the patient. A patient's relationship with a pharmacy is not the equivalent of a doctor-patient relationship. A patient goes to a drug store only after the patient visits a physician and receives a prescription, and then largely to purchase a product. As one court stated,

> In every relationship between a patient and one of the listed health care providers under Indiana Code section 34–18–2–14, independent medical treatment is an important component of the health care provided. This characteristic is lacking in the relationship between a pharmacist and a customer simply requesting that a prescription be dispensed.

*Kroger Co. v. Estate of Hinders,* 773 N.E.2d 303, 306–307 (Ind.Ct.App.2002). Further, the holding in *Short v. Appalachian OH–9, Inc.,* is of dubious value because there is no mention of the rule of construction that statutes in derogation of the common law are to be given a narrow, not expansive and liberal, interpretation. And finally, while *Short v. Appalachian OH–9* gave *W.Va.Code,* 55–7B–2(c) an expansive interpretation, the Legislature supported that interpretation when it amended the statute in 2003 to specifically place emergency medical services authorities and agencies under the umbrella of the MPLA. *See W.Va.Code,* 55–7B–2(g) [2006].

We conclude that because certain medical professionals are specifically included under the MPLA, but pharmacies are not included, means that the Legislature intended to exclude pharmacies. *See, e.g., Sova Drugs, Inc. v. Barnes,* 661 So.2d 393, 395 (Fla.App. 5

Dist.1995) ("Application of the basic rule of statutory construction leads to the conclusion that the Legislature intended to omit pharmacists and pharmacies from this part of the Medical Malpractice Reform Act."). We believe that there is no better definition of what constitutes the medical care community, and therefore what groups and individuals are included as "health care provider[s]" under the MPLA, than the unambiguous and exclusive list of defined providers in *W.Va.Code,* 55–7B–2(c).

■ Accordingly, we hold that a pharmacy is not a "health care provider" as defined by the Legislature in *W.Va.Code,* 55–7B–2(c) [1986].

## IV.

### *Conclusion*

■ The question from the circuit court asks:

> In a civil action filed against a defendant licensed pharmacy for allegedly having negligently dispensed medication, is the pharmacy a "health care provider", as defined by West Virginia Code § 55–7B–2(c)?

We answer the certified question "No."

Certified Question Answered.

MAYNARD, J., files concurring opinion

MAYNARD, Justice, concurring:

I agree with the majority's decision in this case that a pharmacy is not a "health care provider" as defined by W.Va.Code § 55–7B–2(c) (1986) of the Medical Professional Liability Act. Pharmacies are not enumerated in the statute, and in accordance with this Court's long standing rules of statutory interpretation, we cannot add words that the Legislature purposely omitted [1] as is clearly the case here. I am writing separately because I would have gone further than the majority and considered the affidavits of the former legislators.

In this case, the best evidence of legislative intent, which this Court is required to consid-

---

1. *Banker v. Banker,* 196 W.Va. 535, 546–47, 474    S.E.2d 465, 476–77 (1996).

er when construing a statute,[2] is the affidavits of the legislators who were responsible for formulating the final content of the Medical Professional Liability Act. The affiants were members of the Conferee's Committee that dealt with Senate Bill 714 known as the Medical Professional Liability Act of 1986 and included the Chairman of that Committee as well as the Chairman of the House Judiciary Committee. All of these affiants stated that "pharmacists and pharmacies were never included in the original definitions" set forth in the statute. The affidavits do not detail each legislator's opinion but, rather, prove that the Legislature intentionally excluded pharmacies from the definition of "health care provider" under the statute. I do not see how these affidavits, which are powerful and persuasive evidence of legislative intent, can be ignored. Other courts have considered affidavits from joint conference committee members when ascertaining legislative intent with regard to ambiguous legislation, and I would have done so in this case. *See Silver v. Brown*, 63 Cal.2d 841, 48 Cal.Rptr. 609, 409 P.2d 689 (1966).

In the end, absent the evidence provided by the former legislators, the majority still reached the proper decision in this case. Accordingly, I concur.

---

2. *See* Syllabus Point 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975) ("The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature.").