FILED

**November 17, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 16-0136 – *Leggett et al. v. EQT Production Co. et al.*

LOUGHRY, Justice, dissenting, joined by KETCHUM, Chief Justice:


In deciding that this Court's decision in *Tawney*[1] controls the outcome of the instant case–one which presents a question of pure statutory interpretation rather than the lease-driven issue resolved in *Tawney*–the majority has wrongly relied on precedent that is inapposite and clearly not controlling. In its haste to fill the four square corners of *Tawney* with this arguably round case, the majority failed to recognize the distinction between how rules applicable to statutory interpretation differ significantly from those that govern contractual disputes. The majority's affirmative answer to the certified question on the issue of whether *Tawney* controls the statutory right of a lessee of a converted flat-rate lease to deduct post-production expenses from royalty payments was misguided. To conclude that the Legislature, when enacting legislation in 1982,[2] intended to convey the same meaning we implied in *Tawney* by looking to century-old oil and gas law principles is misguided. Furthermore, in failing to fully address the far-reaching effects of deregulation in the gas industry in both *Tawney* and in this case, the majority has left this area of the law improvidently mired in the past. Accordingly, I must dissent.

---

[1]*See Estate of Tawney v. Columbia Nat. Res., L.L.C.*, 219 W.Va. 266, 633 S.E.2d 22 (2006).

[2]*See* W.Va. Code § 22-4-1 (1982), which was later recodified as W.Va. Code § 22-6-8  (1994).

1

The issue addressed by this Court in *Tawney* was whether lease language providing for the lessor's 1/8 royalty to be calculated "at the well," "at the wellhead," or stating that the royalty is "an amount equal to 1/8 of the price, net of all costs beyond the wellhead," or "less all taxes, assessment, and adjustments" permits the lessee to deduct reasonable post-production expenses from the lessor's 1/8 royalty. *See* 219 W.Va. at 268-69, 633 S.E.2d at 24-25. In answering the question certified by the circuit court in *Tawney*, this Court first determined "that the 'wellhead'-type language at issue is ambiguous." *Id.* at 272, 633 S.E.2d at 28. Because the lessee had drafted the subject lease, this Court applied the ambiguity against it to decide that the ambiguity served to prevent the deduction of post-production expenses. *Id.* at 273-74, 633 S.E.2d at 29-30.

In *Tawney,* this Court expressly avoided the opportunity to address the issue of whether post-production costs could properly be allocated between a lessor and a lessee. While acknowledging the split of authority on this issue, we chose not to decide the issue. *See Tawney*, 219 W.Va. at 270-71, 633 S.E.2d at 26-27. Instead, this Court "simply look[ed] to our own settled law" and concluded in *Tawney* that the implied duty on an oil and gas lessee's part to market the subject natural resource does not permit, absent specific *contractual language in a lease* providing for post-production expenses, such deductions. *Id.* at 271, 274, 633 S.E.2d at 27, 30; *see also Wellman v. Energy Resources, Inc.*, 210 W.Va. 200, 211, 557 S.E.2d 254, 265 (2001) (following decisions of Colorado, Kansas, and

2

Oklahoma to hold that lessee impliedly covenants to market oil or gas produced which in turn requires lessee to bear post-production and transportation costs unless lease provides otherwise).

As the respondent EQT Production Company ("EQT") correctly argues, application of *Tawney* defies both logic and reason because, unlike this case, *Tawney* did not involve a flat-rate lease or the statute that governs such leases. *See* W.Va. Code § 22-6-8. In clear contrast to *Tawney*, this case should have been decided based solely on the language of the statute independent of any implied covenant that may have arisen under a lease agreement. And, under the statute, royalty payments for a converted flat rate lease are required to be determined from the total amount received by the lessee "at the wellhead." *Id.* By so designating, the Legislature was clear in specifying that such amount is calculated "at the wellhead" rather than at some downstream location or at the interstate pipeline.[3] In adopting the position of the landowners/petitioners in this case, the majority has wholly ignored the fact that the phrase selected by the Legislature in 1982–"at the wellhead"–had a well-established meaning within the industry when it was designated as the valuation point for royalty payments. *See* W.Va. Code § 22-4-1 (1982); *Kilmer v. Elexco Land Services,*

---

[3]In drafting the legislation through which the statutory section at act was enacted, the Legislature considered and rejected earlier versions of the statute that would have omitted "at the wellhead" and instead required payments based merely on "gross proceeds" or the "total amount" received.

3

*Inc.,* 990 A.2d 1147, 1155 (Pa. 2010) (discussing fact that in 1979, pre-deregulation "the wellhead was the point of royalty measurement" and further explaining that gas was less valuable at this stage of valuation than after its alteration from raw to "sweet" gas as result of removing extraneous substances).[4]

Seeking quite literally to profit from the ambiguity analysis relied upon in *Tawney*,[5] the petitioners duped the majority into believing that the statutory use of the phrase "at the wellhead" is ambiguous. Asserting a reed thin theory, the petitioners persuaded the majority that the finding by this Court in *Tawney* that such phrase was ambiguous–in a lease that required the lessee to pay royalties based on a percentage of proceeds and imposed an implied duty to market–compels the conclusion in this case that the statutory use of that phrase must necessarily also be ambiguous. Overlooked by the majority is the fact that the ambiguity identified in *Tawney* was in reference to whether post-production expenses could

---

[4]At least one recognized oil and gas treatise has expressed such puzzlement at this Court's finding of ambiguity in *Tawney* that it questioned "whether the court was really looking at a bargain struck between the parties or just imposing what it perceived to be a 'fair' and/or 'equitable' result." Williams & Meyers, *Oil and Gas Law*, § 645.2 at p. 614.12(14) (2016).

[5]By seeking to get the gas valued downstream as opposed to "at the wellhead," the petitioners are trying to enhance their royalty payments. *See generally Appalachian Land Co. v. EQT Production Co.*, 468 S.W.3d 841, 854 (Ky. 2015) (stating that "unprocessed natural gas at the well-head is much less valuable" compared to "processed, enhanced product delivered to the point of sale downstream"); *Kilmer,* 990 A.2d at 1155 (explaining that transformation of raw (sour) gas into marketable natural gas (sweet gas) increases price/value of gas).

be deducted when calculating the royalty paid to the lessors. Upon analysis, it was not the phrase itself in terms of what "at the wellhead" signifies that presented ambiguity but whether any deductions could be taken from the "at the wellhead" extraction value. *See Rogers v. Westerman Farm Co.*, 29 P.3d 887, 897 (Col. 2001) (acknowledging argument "that 'at the well' language is silent with respect to allocation of costs"); Williams & Meyers, *Oil and Gas Law*, § 645.2 at p. 614.12(14) (addressing the "head scratching" finding of ambiguity in *Tawney* and stating: "If anything, the term 'wellhead' is very precise and definite because it is a clearly recognizable place which even laypersons can understand."). Significantly, the petitioners in this case persuaded the majority that "at the wellhead" no longer means what it says: instead it refers to the point at which the gas is delivered downstream where it has been transformed from raw, impure gas into "sweet" and inherently more valuable gas.[6]

The petitioners propounded at length concerning how the deregulation of the gas industry in the mid-1980s and early 1990s altered the point at which gas is sold. *See Clough v. Williams Prod. RMT Co.*, 179 P.3d 32, 35-36 (Col. Ct. App. 2007) (detailing natural gas deregulation history and commenting that "before deregulation, buyers purchased gas at or near the wellhead, thereby absorbing most post-wellhead costs" but "[n]ow most gas is purchased away from the wellhead"). Implying that this Court's decision in *Tawney*

---

[6]*See supra* note 5.

5

was directly affected by the deregulation of the gas industry, the petitioners state that our decision flowed from our recognition that gas is no longer sold at the point of the wellhead but at a subsequent point farther down the line only after the lessee has increased its value.[7] This suggestion is disingenuous and misleading as the deregulation of the gas industry is not even mentioned in *Tawney,* let alone relied upon as a basis for the Court's decision. As discussed above, what impelled this Court's decision in *Tawney* was a century-old approach to oil and gas–the implied duty to market. *See Tawney*, 219 W.Va. at 271, 633 S.E.2d at 27.

In designing the mechanism pursuant to which lessors would receive a 1/8 royalty when a flat rate lease was converted by means of West Virginia Code § 22-6-8, the Legislature opted to link the royalty payment owed to the "at the wellhead" price of gas. When this terminology was first selected in 1982, the Legislature was fully apprised as to the meaning of that phrase. *See also Kilmer*, 990 A.2d at 1157 (observing that when its Guaranteed Minimum Royalty Act was enacted in 1979, Pennsylvania "legislature was not faced with a choice of whether the [royalty] calculation should be made at the wellhead or the point of sale *because they were one and the same*") (emphasis supplied); *Cotiga Dev. Co. v. United Fuel Gas Co.*, 147 W.Va. 484, 128 S.E.2d 626 (1962) (distinguishing between wellhead or field price of gas from price received by lessee when gas is marketed). And,

---

[7]Rather than citing to actual statements or findings made by this Court, the petitioners merely repeated arguments that were raised by the petitioners in *Tawney*. *See* 219 W.Va. at 270, 633 S.E.2d at 26.

when the statute was recodified in 1994–after deregulation had altered the point at which gas was being sold–the Legislature nonetheless chose to retain the "at the wellhead" valuation point for purposes of applying the provisions of West Virginia Code § 22-6-8. As a result, until such time as the Legislature chooses to amend the subject statute, the phrase "at the wellhead" identifies with specificity the location for computing the price on which statutory royalty payments are to be made. *See id.*

The principle of contract interpretation relied upon by this Court in concluding that the phrase "at the wellhead" was ambiguous in *Tawney*[8] cannot be applied to the current issue of statutory interpretation. Whereas ambiguity in a contract may be construed against the drafter of that document,[9] such an ambiguity cannot be analogously construed against the Legislature.[10] We are required to assume that the Legislature selected its terminology with a specific purpose in mind. *See State ex rel. Barrat v. Dalby,* 236 W.Va, 316, 317, 779 S.E.2d 584, 587 (2015) (recognizing precept that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there") (internal citations

[8]As I discussed above, it is not the phrase "at the wellhead" that this Court actually found ambiguous in *Tawney*, but whether that phrase permitted post-production expenses to be deducted from the royalty owed.

[9]*See* Syl. Pt. 1, *Martin v. Consol. Coal & Oil Corp.*, 101 W.Va. 721, 133 S.E. 626 (1926) ("The general rule as to oil and gas leases is that such contracts will generally be liberally construed in favor of the lessor, and strictly as against the lessee.").

[10]Citing no authority for its proposition, the petitioners fallaciously state that "the same test for ambiguity exists between contractual language and statutory language."

7

omitted). In 1982 when the subject statute was first enacted, lessors were routinely paid royalties based on a wellhead price. Thus, "at the wellhead"–a phrase that can be stated in no clearer terms–was selected for the point of valuation because this was the location from which gas was being sold and thus, by extension, was the point at which extracted gas was valued for royalty purposes. *See Appalachian Power Co. v. Tax Dept.,* 195 W.Va. 573, 582, 466 S.E.2d 424, 433 (1995) ("'If the intention of the Legislature is clear, that is the end of the matter.'") (quoting *Chevron U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837, 843 (1984)).

In stark contrast to the rules used to apply oil and gas contracts, the rules that govern statutory interpretation require strict construction when the statute operates in derogation of the common law. *See* Syl. Pt. 3, *Phillips v. Larry's Drive-in Pharmacy, Inc.*, 220 W.Va. 484, 647 S.E.2d 920 (2007). And as we further observed in *Phillips*:

> Statutes which impose duties or burdens or establish rights or provide benefits which were not recognized by the common law have frequently been held subject to strict, or restrictive, interpretation. When there is any doubt about their meaning or intent they are given the effect which makes the least rather than the most change in the common law.

*Id.* at 491, 647 at 927 (quoting Norman J. Singer, 3 *Sutherland Statutory Construction* § 61:1 at 217 (6th ed. 2001)). For the petitioners to argue, and the majority to accept, that their interpretation of the statute as permitting the use of the downstream price rather than the wellhead price is in harmony with the common law is patently preposterous. Historically,

8

gas was sold and valued at the wellhead. Until deregulation altered the course of business, the pipeline companies bore the costs of gathering the gas and transporting it downstream to buyers. *Kilmer*, 990 A.2d at 1155. The pipeline companies paid the producers a wellhead price, and the producers paid royalties on that wellhead price. *Id.* Once deregulation arrived, the pipeline companies became interstate carriers and not buyers and gatherers of the gas. *Clough*, 179 P.3d at 36-36. Only then was the concept of the netback method of royalties[11] employed as a manner of permitting the producers to deduct some or all of the additional costs of transporting the gas downstream. As can be readily seen, the interpretation that the petitioners advanced–their statutory entitlement to a downstream valuation rather than a wellhead valuation–rather than flowing naturally from the common law, required a laborious swim upstream that is in clear contravention of legislative intent.

The majority has been hoodwinked into believing that the remedial nature of West Virginia Code § 22-6-8 compels the result reached in this case. With the objective of "accomplishing all the purposes intended" by the Legislature in its decision to replace flat rate royalties where possible, the majority has determined that the only way to fully serve the purposes of the Legislature is to maximize the royalties received by the lessors. *See State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W.Va. 770, 777, 461 S.E.2d 516,

---

[11]Under the netback method, the additional costs of transporting the gas downstream to market are deducted to arrive at the wellhead price.

523 (1995). The problem with relying on the statute's remedial purpose is that the majority has improperly broadened the reach of the statute. The petitioners have clearly benefitted by the conversion of their flat rate leases under which they were receiving a $300 per annum payment. In presuming that any deduction taken from the price of the gas would defeat the compensatory purposes of the statute, the majority has overstepped its jurisdiction and expanded the reach and effect of the statute. *See Henthorn v. Collins*, 146 W.Va. 108, 111, 118 S.E.2d 358, 360 (1961) ("[T]he duty to construe a remedial statute liberally can not amount to authority to a court to extend a statute to a case wholly beyond its effects."); *Wiseman v. Crislip*, 72 W.Va. 340, 348, 78 S.E. 107, 111 (1913) (recognizing that rule of remedial construction "does not authorize the court to add other supposed evils, purposes, and objects").

Simply put, there is no authority for the interpretation the majority handed the petitioners, whose clear aim is to obtain a royalty payment that is calculated on a preferential, downstream price without permitting any deductions related to transporting the gas to that location. The statute is wholly silent on the issue of deductions. Given the far reaching alterations to the gas industry since deregulation, the Legislature needs to revisit the issue of whether the producer of gas may take any deductions from gas that is subject to royalty payments under West Virginia Code § 22-6-8. The Legislature also needs to revisit the point at which that valuation is made. If the statute is not amended to provide for a point other

10

than the wellhead, then the Legislature needs to duly consider whether it is proper, as the majority has now set in place, for the lessors to benefit from the improved downstream cost of gas without having to contribute one penny towards either the transportation of that gas from the wellhead to the point of distribution or its improvement along the way. The landowners are clearly benefitting from the conversion statute–the question is whether they are benefitting beyond what the Legislature intended.

The petitioners seek to have their cake and eat it, too.[12] When it serves their purposes to apply age-old principles relied upon to resolve the ambiguity at the center of *Tawney,* they adhere to that approach. But when it benefits their pocketbooks to rely upon the effects of deregulation, they seize upon specific valuation concerns that arose specifically in response to deregulation. Given this Court's failure to address the effects of deregulation on the gas industry in *Tawney*,[13] it is not surprising that those issues resurfaced in this case. What the majority should have recognized, however, is that the reasoning this Court applied in *Tawney* to avoid acknowledging changes to the gas industry deregulation has absolutely

---

[12]The petitioners in this case seek to gain the advantage of increased downstream gas valuation but to avoid having to bear any costs associated with the downstream travel and improvement.

[13]As one commentator has observed in its analysis of *Tawney*: "Since it was treating the language as ambiguous, the court should have admitted extrinsic evidence to explore the nature of the changing natural gas market in the United States, which might have explained why it would have been unlikely for a producer to use the netback methodology when gas sales took place at the well." Williams & Meyers, § 645.2 at p. 614.12(14).

11

no bearing on the pure statutory issue presented in this case. And, in taking the path of least resistance, the majority has merely prolonged the inevitable–squarely facing the far-reaching issues that deregulation has brought to the oil and gas industry. By clinging to the ill-advised and arcane approach this Court employed in *Tawney*, the majority has stubbornly refused to revisit whether this state, consistent with the majority of the states in this country, should adopt the "at the well" rule, which permits the deduction of post production costs when calculating royalty payments. *See Appalachian Land Co. v. EQT Production Co.*, 468 S.W.3d 841, 843 (Ky. 2015); *see also Pollack v. Energy Corp. of America*, 2012 WL 6929174 at *3 (W.D. Pa. 2012) (identifying *Tawney* as belonging to minority view on issue of permitting post-production deductions).

Accordingly, I dissent.