**FILED**
**June 11, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 20-0694 – *State of West Virginia ex rel. AmerisourceBergen Drug Corporation, et al. v. Honorable Alan D. Moats*

and

No. 20-0751 – *State of West Virginia ex rel. Johnson & Johnson, et al. v. Honorable Alan D. Moats, et al.*

Justice Hutchison, concurring:

I write separately to applaud the majority for a well-researched and well-reasoned opinion that tries, in some small measure, to bring order to the legal chaos caused by the opioid crisis. It was a challenge of the highest order for the majority to cogently address the claims raised by the defendants, the companies that made, distributed, and dispensed opioid drugs in West Virginia. To be blunt, the opioid crisis is "a man-made plague, twenty years in the making. The pain, death, and heartache it has wrought cannot be overstated."[1] With a deft hand, the majority opinion addresses the theoretical concerns

---

[1] *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2018 WL 6628898, at *21 (N.D. Ohio Dec. 19, 2018). *See also*, Andrew Kolodny, *et al.*, *The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction*, 36 Ann. Rev. Public Health 559, 560 (2015) ("According to the United States Centers for Disease Control and Prevention (CDC), the unprecedented increase in OPR [opioid pain reliever] consumption has led to the 'worst drug overdose epidemic in [US] history.' Given the magnitude of the problem, in 2014 the CDC added opioid overdose prevention to its list of top five public health challenges."); Julie Garner, *The Opioid Boom*, U. Wash. Mag. (December 7, 2017) (describing the over-prescription of opioid medications, professor Gary Franklin said, "It has been the worst man-made epidemic in modern medical history.").

1

raised by the defendants while simultaneously leaving the Mass Litigation Panel with the freedom to move this case forward toward a just conclusion.

As this case demonstrates, the opioid crisis has triggered a complex maze of litigation that seeks to place responsibility for the epidemic on the companies that profited from making and selling the opioid medications. The plaintiffs in this case are various cities, counties, and hospitals seeking legal compensation for past out-of-pocket losses they allege were caused by the defendants pumping opioids into their communities. The plaintiffs also seek equitable remedies, including injunctions to stop the frenetic distribution of opioids into West Virginia. Additionally, the plaintiffs seek an equitable solution from the defendants to abate widespread opioid addiction, to fix existing and future opioid-related problems in their communities, and to right what the plaintiffs see as a foundering ship. The plaintiffs filed their lawsuit, the case was referred to the Mass Litigation Panel, and the motions started flying. The Mass Litigation Panel is a group of circuit judges trained and well-experienced in shepherding complex cases to a fair conclusion. In my two-and-a-half decades as a circuit judge, my service included over two decades of service on the panel. This opioid case is exceptionally complicated, and I sympathize with the trial judges on the panel rassling with the dozens upon dozens of issues being lobbed their way by the parties' lawyers.

A careful reading of the majority's opinion makes it pretty clear that the defendants are, to use a cliché, just throwing spaghetti at the wall and hoping something sticks. By my count, this case is based upon the sixth and seventh petitions for writs of

2

prohibition filed by the defendants. Instead of these petitions being helpful to the process and focusing the trial judges on a speedy and fair resolution, the petitions appear to be roadblocks to keep the trial judges from ever setting the case for a trial on the merits.[2]

My central concern when I saw the defendants' petitions on this Court's docket is simple: this case cannot make any progress beyond the complaint stage. This Court has said that it will not micromanage the work of circuit judges. Nor will it micromanage the work of the judges who serve on the Mass Litigation Panel. These judges are in the trenches grappling with questions whose answers depend on the varied and unique facts of the case. Judges make decisions based on the situation as they see it at that moment, but just as quickly judges are allowed to change their mind when presented with new facts, new arguments, and new legal precedent. Yet time and again, lawyers dissatisfied with the ruling of a judge will petition this Court to body-check the judge and disrupt the course of the case below.

The majority's opinion is brilliant because it navigates the problems created by the defendants' petitions and expresses the unquestionable principle that our system of justice is founded upon jury trials. Two-and-a-half centuries ago, Blackstone extolled the value of juries in his *Commentaries* as a principal tool in "secur[ing] the just liberties of

---

[2] It has been my personal experience that the parties will often use original jurisdiction petitions as a way to slow down a particular lawsuit in an effort to control the pace of the case and, thereby, effectively control its outcome.

3

this nation for a long succession of ages."[3] He noted that, as far back as the Magna Carta in 1215, juries were "more than once insisted on as the principal bulwark of our liberties" because juries are "excellently contrived for the test and investigation of truth."[4] Blackstone also observed that "it is the most transcendent privilege" and "the glory of the English law" that a citizen "cannot be affected either in his property, his liberty, or his person, but by the unanimous consent of . . . his neighbors and equals."[5] The majority opinion applies these fundamental principles and concludes, "To the extent that the public nuisance liability determination and Plaintiffs' legal claims present *common issues*, the order of trial must be such that the jury first determines those *common issues*." (Emphasis added). I have no qualms with this general statement or application of the law.

Where I, perhaps, stand separate from the majority opinion is on the question of timing. It is so early in the development of this case that no one really knows what "common issues" are involved, or the parameters of either the plaintiffs' nuisance action

---

[3] 3 William Blackstone, *Commentaries on the Laws of England*, 379 (1765-69). Blackstone also reflected that the right to trial by jury should be "guard[ed] with the most jealous circumspection" lest "time imperceptibly undermine this best preservative of English liberty." He noted that where governments had rejected trials by jury, "the liberties of the commons are extinguished" and "the government is degenerated into a mere aristocracy." *Id.* at 381.

[4] *Id.* at 365.

[5] *Id.* at 379. *See also* 1 Matthew Hale, *The History of the Pleas of the Crown* 33 (1736) ("[T]he law of England has afforded the best method of trial that is possible, of this and all other matters of fact, namely by a jury . . . concurring in the same judgment, by the testimony of witnesses *viva voce* in the presence of the judge and jury, and by the inspection and direction of the judge.")

or their tort claims. As I said, this case has not made it past the pleading stage. The judges on the Mass Litigation Panel cannot begin to outline a trial plan because, again, the defendants keep disrupting the progress of the case by filing petitions under this Court's original jurisdiction. To clarify, the parties have not conducted discovery nor have they identified their trial evidence or witnesses. And, importantly, the plaintiffs have not yet offered the judges on the panel a clear outline of the issues they want to resolve by trial. Hence, the defendants' arguments in this case "present[] a hypothetical controversy" that, typically, this Court would "not resolve with an advisory opinion." *State ex. rel. Perdue v. McCuskey*, 242 W. Va. 474, 479, 836 S.E.2d 441, 446 (2019). As we once said in Syllabus Point 2 of *Harshbarger v. Gainer*, 184 W. Va. 656, 403 S.E.2d 399 (1991), "[c]ourts are not constituted for the purpose of making advisory decrees or resolving academic disputes," yet for all intents and purposes, the majority opinion has done nothing more than eloquently resolve academic questions posed by the defendants.

Take, for instance, the defendants' arguments regarding the plaintiffs' request in their complaint for abatement. "Abatement" is an equitable form of relief and is simply the "act of eliminating or nullifying" whatever is causing the public nuisance. Bryan A. Garner, *Black's Law Dictionary* (11ᵗʰ ed. 2019). "Jurisdiction in equity to abate nuisances is undoubted and of universal recognition." *State v. Ehrlick*, 65 W. Va. 700, 705, 64 S.E. 935, 937 (1909). The law is clear that "[a]n activity that diminishes the value of nearby property and also creates interferences to the use and enjoyment of the nearby property may be abated by a circuit court applying equitable principles." Syl. pt. 12, *Burch*

5

*v. Nedpower Mount Storm, LLC*, 220 W. Va. 443, 647 S.E.2d 879 (2007). The common law of equity offers judges the opportunity to formulate creative remedies to abate a nuisance, such as clean-up costs, or a common law fund to restore property values diminished by a nuisance. *See*, *e.g.*, Jason J. Czarnezki & Mark L. Thomsen, *Advancing the Rebirth of Environmental Common Law*, 34 B.C. Envtl. Aff. L. Rev. 1, 27 (2007) (discussing creation of an equitable fund so that "plaintiffs would have a remedy available that would allow for direct cleanup and full use of their property in the post-restoration future[.]"). In this case, neither the parties nor the judges have explored the scope of potential remedies because of the delays caused by the filing, by the defense, of these several petitions for writs of prohibition.

The defendants insist they have a right to a jury trial to resolve the plaintiffs' equitable claim that the defendants created a public nuisance. The defendants claim that because they might have to open their pocketbooks and fork out cash to abate and fix the nuisance that they supposedly created, the plaintiffs are actually alleging a legal claim that must be tried to a jury. This argument is nonsense. A judge has broad powers to halt and correct a nuisance. Merely because there is a monetary cost to the judge's chosen remedy does not create a right to a jury trial. For instance, an injunction, which tells a defendant to stop doing something, can carry monetary costs for the defendant. Bankruptcy actions, which involve divvying up money and other assets of the bankrupt debtor, are basically

equitable and handled exclusively by a judge, not a jury.[6] The right to a jury trial arises when there is no equitable way to halt or correct the harm created by the defendant, that is, when the harm is done and all that is left to the plaintiff is to assert a legal claim (like one for negligence) and demand cash damages that substitute for the harm inflicted.

The majority opinion gave voice to the defendants' questions about abatement but refused to give an answer. The majority notes that the defendants' arguments are being raised "in the extremely early stages of these cases," and that the answer lies in the facts and arguments yet to be made by the parties. And, wisely, the opinion leaves it at that.

In summary, the defendants' arguments in this case about abatement (or anything else) were both premature and wholly academic. The majority opinion recites these arguments and, despite the majority's decision to issue a modified writ of prohibition, effectively leaves *all* of the arguments raised by the defendants for future resolution. The majority opinion does not require that the panel hold a jury trial; it merely says that, if the plaintiffs insist on entangling their legal and equitable claims, then the defendants are entitled to assert their right to a jury trial of the entangled issues. The judges on the Mass Litigation Panel should recognize that when they again take back the reins of this case.

---

[6] *See Katchen v. Landy*, 382 U.S. 323, 327 (1966) (bankruptcy "courts are essentially courts of equity, and they characteristically proceed in summary fashion to deal with the assets of the bankrupt they are administering.").

The panel should move this case forward toward a resolution based upon the facts and law as they *actually* exist, and not simply on hypothetical problems that the lawyers *claim* exist.

One final concern I have with this case is the defendant manufacturers' attempt to make an "empty chair" argument to rebut the plaintiffs' claim that the defendants should be responsible for creating a public nuisance. The defendants seek to blame "non-parties," entities that were not sued by either the plaintiffs or the defendants: pharmacies, pharmacists, doctors who prescribed the defendants' drugs, individuals who bought the defendants' drugs but then illegally sold them to people suffering from addition, and other drug manufacturers. The parties have not yet begun discovery, yet the defendants' petition demands that this Court bind the trial judges to a specific evidentiary ruling allowing the defendants to deflect blame onto dozens of other unknown, unnamed, un-sued entities who are nowhere near to the courtroom. The defendants' argument is absurdly premature and was properly rejected wholesale by the majority opinion.

Moreover, the defendants insist that West Virginia Code § 55-7-13d binds the trial judges in this case. I disagree. In 1979, this Court adopted the common law principle of comparative fault into tort actions and ruled that "[a] party is not barred from recovering damages in a tort action so long as his *negligence* or fault does not equal or exceed the combined *negligence* or fault of the other parties involved in the accident." Syl. pt. 3, *Bradley v. Appalachian Power Co.*, 163 W. Va. 332, 256 S.E.2d 879 (1979) (emphasis added). When the Legislature enacted West Virginia Code § 55-7-13d in 2015, it sought to alter the common law of "principles of comparative fault" governing tort

8

actions. W. Va. Code § 55-7-13a(b) (2015).[7] If the plaintiffs were seeking to hold the

defendants at fault for *negligently* harming the plaintiff cities, counties, and hospitals, and

the parties were able to develop evidence upon which a jury could base a reasoned

comparative negligence verdict, then it might be proper for a trial court to permit the jury

to allocate fault between parties and non-parties under West Virginia Code § 55-7-13d.

However, as this opioid case was presented to this Court in the defendants'

petitions, the plaintiffs are *not* asking for negligence-based damages or an allocation of

---

[7] To the extent the statute seeks to change the common law, it is a long-standing maxim that "[s]tatutes in derogation of the common law are strictly construed." Syl. pt. 1, *Kellar v. James*, 63 W.Va. 139, 59 S.E. 939 (1907). *Accord*, Syllabus Point 3, *Bank of Weston v. Thomas*, 75 W.Va. 321, 83 S.E. 985 (1914) ("Statutes in derogation of the common law are allowed effect only to the extent clearly indicated by the terms used. Nothing can be added otherwise than by necessary implication arising from such terms."); Syl. pt. 5, *Phillips v. Larry's Drive-In Pharmacy, Inc*., 220 W. Va. 484, 647 S.E.2d 920 (2007) ("Where there is any doubt about the meaning or intent of a statute in derogation of the common law, the statute is to be interpreted in the manner that makes the least rather than the most change in the common law."). To the extent the statute seeks to impose a rule of procedure upon the courts, Article VIII, Section 3 of the West Virginia Constitution "unquestionably provides this Court with the sole constitutional authority to promulgate rules for the judicial system, and demands that those rules have the force of law." *State ex rel. Workman v. Carmichael,* 241 W. Va. 105, 132, 819 S.E.2d 251, 278 (2018). *Accord*, Syl. pt. 10, *Teter v. Old Colony Co*., 190 W. Va. 711, 714, 441 S.E.2d 728, 731 (1994) ("Under Article VIII, ... Section 3 of the Constitution of West Virginia (commonly known as the Judicial Reorganization Amendment), administrative rules promulgated by the Supreme Court of Appeals of West Virginia have the force and effect of statutory law and operate to supersede any law that is in conflict with them."); Syl. pt. 1, *Bennett v. Warner*, 179 W. Va. 742, 372 S.E.2d 920 (1988) ("Under article eight, section three of our Constitution, the Supreme Court of Appeals shall have the power to promulgate rules for all of the courts of the State related to process, practice, and procedure, which shall have the force and effect of law."). "Not only does our Constitution explicitly vest the judiciary with the control over its own administrative business, but it is a fortiori that the judiciary must have such control in order to maintain its independence." Syl. pt. 2, *State ex rel. Lambert v. Stephens*, 200 W. Va. 802, 490 S.E.2d 891 (1997).

fault for that negligence. Instead, the plaintiffs are asking solely for a determination of whether the defendants created a public nuisance, which is broadly defined as "an unreasonable interference with a right common to the general public." *Restatement (Second) of Torts* § 821B (1) (1979). *See also*, *Hark v. Mountain Fork Lumber Co.*, 127 W.Va. 586, 595–96, 34 S.E.2d 348, 354 (1945) ("A public nuisance is an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons."). Whether a defendant unreasonably interfered with the rights of citizens to enjoy their property and livelihoods is generally a question with a "yes" or "no" answer. There is no equivocation in the answer, and it certainly does not involve any allocation of negligence or fault. West Virginia Code § 55-7-13d just does not apply to actions for a public nuisance.

Furthermore, West Virginia Code § 55-7-13d is clear that in order for an entity to be a "non-party" in a negligence action, the actual parties must first make a bona fide attempt to sue and serve those entities and so try (but fail) to make them actual parties to the suit. To read the statute otherwise is to invite every defendant in every civil suit to flail about, blaming strangers for harms caused by the defendant without giving the stranger an opportunity to defend his or her reputation. To paraphrase the cliché, spaghetti will be thrown at strangers with hope that it sticks. There is nothing in the record of this case to suggest that the parties ever tried, let alone failed, to bring into this lawsuit the dozens of entities upon whom the defendants now seek to foist fault. By its own terms, the statute cannot be relied upon by the defendants in this case.

10

Hence, as an academic question, the judges on the panel were absolutely correct that West Virginia Code § 55-7-13d has no application to the public nuisance action brought by the plaintiffs. Likewise, the majority opinion properly refused to adopt the defendants' assertions regarding the statute.

Again, I express my admiration for the finesse applied by the majority opinion to the complicated, speculative questions raised by the defendants in their petitions. The majority opinion both upholds the fundamental right to a jury trial, while simultaneously preserving the ability of the trial court to formulate whatever trial plan is necessary to expeditiously resolve the parties' dispute.

Accordingly, I respectfully concur.